[S. F. No. 3493.  In Bank.—November 30, 1907.]

## WILLIAM FORSYTH, Respondent, v. A. B. BUTLER, Appellant.

PARTNERSHIP ACCOUNTING—RAISIN PACKING — EVIDENCE — FINDINGS.— In an action between partners engaged in the business of packing and selling raisins, for an accounting, the evidence is reviewed and held sufficient to sustain the findings that the defendant had been properly credited for his individual crop of raisins delivered to the firm, that the same was graded and accounted for in accordance with the regular methods of the partnership business and the partnership agreement, and that such grading was not fraudulent.

ID.—MONEY DRAWN BY PARTNER—INTEREST.—The charge made against the defendant for interest on account of money drawn by him from the firm is held not sustained by the evidence contained in the present record on appeal, and as no proper adjustment of this matter can be made as the record stands, a new trial is ordered of this issue.

ID.—LIABILITY OF PARTNER FOR INTEREST.—If one partner is indebted to the firm, either in respect of money borrowed or in respect of balances in his hands, he ought to be charged with interest on the amount so owing, even though on the balance of the whole account a sum might be due him. Except, however, where there has been a fraudulent retention, or an improper application, of money of the firm, it is not the practice of the court to charge a partner with interest on money of the firm in his hands; for example, under ordinary circumstances a partner is not charged with interest on sums drawn out by him or advanced to him.

ID.—OVERDRAFT BY PARTNER.—Where there has been no fraudulent retention of moneys of the firm by a partner, but a mere inadvertent overdrawing by him of his account with the firm, the part-

ner so overdrawing should be charged with interest on the overdraft from the time he drew it down to the time of settlement.

ID.—PARTNER AS CREDITOR OF FIRM—ADVANCES ON SALES.—Where a partner is also an individual creditor of the firm for goods sold to it, he should not be charged interest on advances made him against such goods after the time when he became entitled to a settlement with the firm on account of such sale.

APPEAL from a judgment of the Superior Court of Fresno County and from an order refusing a new trial. J. R. Webb, Judge.

The facts are stated in the opinion of the court.

Stanton L. Carter, for Appellant.

Frank H. Short, for Respondent.

SHAW, J.—The plaintiff and defendant were partners in the business of packing and selling raisins grown in the season of 1894. Each was also a grower of raisins on his own account, and each delivered to the firm the raisins grown by him, to be packed and sold by the firm for his individual account. After the dissolution of the partnership, Forsyth began this action for an accounting of the firm affairs. Butler thereupon began an independent suit against Forsyth, also for an accounting. The two actions were consolidated for trial and judgment and but one decision was made for the two cases, covering all the issues in both of them. Butler appeals from the judgment and from an order denying his motion for a new trial.

The principal questions presented arise from differences concerning the settlement of the respective accounts of the members, individually, with the firm, for the packing of the individual crop of each by the firm. According to the partnership agreement, Butler was to have charge of the keeping of the books of the firm and of the storing, shipping, and selling of the packed product, while Forsyth was to attend to the receiving, grading, and packing thereof. The crop of each partner was delivered to the firm to be packed and sold for his account, on the same terms as were fixed for other growers, with an exception to be hereafter referred to. The

packing contract with the growers provided that when the raisins were delivered at the packing house by the grower the firm should "make a just and true grading according to quality, which grade shall be the basis of the proportionate amount of net receipts from the sale of raisins packed and sold by (the firm) during the season . . . to which said grower shall be entitled"; that all raisins received by the firm during the season from all growers were to be "graded alike as far as possible," but that, in packing and selling them, all the raisins of each grade were to be intermingled and packed and sold together, without distinction as to the persons delivering them. The different grades of raisins were of different values, ranging from three to seventeen cents a pound, and, as a result, the value of each crop depended upon the proportion of high grade raisins to be found therein. As they were intermingled in the packing it was necessary, in order to have a basis of settlement with each grower, that an account should be kept of the total number of pounds delivered by each grower and also a record, either of the total number of pounds of each grade delivered by him, or of the proportion or percentage of each grade which his particular raisins would contain. In practice the uniform custom of the firm was to keep an account only of the total number of pounds of all grades delivered by each grower, and to determine the number of pounds of each grower belonging to the different grades by making tests of his raisins, from time to time, as they were delivered, to ascertain what percentage of each grade they contained, and to find the quantity of the respective grades in the particular crop by means of the percentages thus ascertained. These tests and percentages were made by a "grader" in the employ of the firm, and under the supervision of Forsyth, and were by the grader entered in a book known as the "grade book," which was delivered to the bookkeeper at the close of the season. The grades of the raisins of the two partners, however, were entered only on sheets of paper delivered with the book.

The principal contention of Butler is that his raisins were either not correctly graded or not graded at all; that he had, and should have been credited with, a large quantity of the best quality of raisins, designated as "5 crown" and "6 crown" clusters, whereas he was not credited with any, and

that he was credited with a much larger quantity of the poorer and least valuable grades of raisins than he actually had, and that, in consequence, the "proportionate amount of the net receipts" of the total sale of raisins for the season, allotted to him, according to the books of the firm, and the test grading made, was much less than the true amount. The findings were against him on these points and he claims that they are not sustained by the evidence.

A vast amount of evidence, covering nearly seven hundred pages of the printed transcript, was introduced on this subject. We have examined it carefully and we are satisfied that there is sufficient evidence to support the findings, not only in this, but also in all other essential particulars in which it is claimed to be insufficient, including the finding that the grading was not fraudulent.

That there were test gradings made of the raisins of Butler is established beyond doubt. There is considerable evidence tending to show that these gradings did not fairly show the actual quantity of each grade. There is also a good deal of evidence to the effect that it was a fair and just grading. The evidence being in substantial conflict, the finding is conclusive on this court. The method of grading adopted would be necessarily, to some extent, inaccurate, and less satisfactory than a separation of the entire crop into grades and ascertaining the respective amounts by actual weighing of them all. It was, however, much less expensive, and there is reason to believe from the evidence as to the manner of carrying on the business that it was the only practicable method. In any event, it was the uniform method used by the firm. Butler knew the method, was fully advised of the fact that it was uniformly followed and must have expected that his own raisins would be graded in the same way. He was informed of the grading actually made of his raisins. With this knowledge, he sold the entire output himself and thus made it impossible thereafter to make any other or better grading. The court was justified in concluding that he had consented to the method adopted and that no fairer grading or adjustment of the matter was feasible after the goods were all disposed of.

The partnership agreement contains the following provision: "In the event either of the said partners should have handled and packed by said firm more of his individual

raisins than the other, the surplus is to be packed, handled and sold at the actual cost of the same to the said firm.'' The crop of Butler exceeded that of Forsyth by 915,899 pounds. This surplus was all of the kind known as ''Loose Muscatels.'' Butler and Forsyth each signed a ''grower's agreement,'' the same as other customers of the firm. This agreement provided that the firm should charge ten dollars a ton for packing this grade of raisins in fifty-pound boxes. In casting the account, this rate was charged to each, so far as the crops were equal. But as the surplus was to be packed by the firm at its actual cost only, which was found to be only $4.50 a ton, Butler was not charged $4579.49 for the packing of his surplus at ten dollars a ton, but only $2060.77, the actual cost. As not alone packing, but also handling and selling, was to be done at actual cost, and it was the manifest intent of this clause of the contract that Butler was to derive no advantage or profit from the work done by the firm with respect to this surplus, the referee made a charge to Butler in favor of the firm of $1753.80, which sum he found to be the actual cost to the firm of the handling and selling of the surplus. It was found that the cost to the firm of the handling, packing, and selling of the raisins at the Fresno house for that year, exclusive of the $4.50 a ton for packing, was a sum equal to 6.026 per cent of their gross value. The cost of any particular lot of raisins would obviously be the same percentage of the gross value thereof. The gross value of the Butler surplus was $29,103.87, 6.026 per cent of which is $1753.80, the amount charged. In computing the total expenses of all the raisins which went to make up this percentage there were included all the general and incidental expenses of the business, except certain specific charges for expense, such as packing, commissions, and the like, which were separately accounted for. This was the correct method, and was in conformity with the provisions of the contract above quoted. To find the actual cost to the firm of any lot of raisins it would be necessary to ascertain the percentage of the general expense properly chargeable to each pound, or to each dollar's worth of the total value, as was done here. To compute the cost at the rate per pound would not be as favorable to Butler, or at any rate no more so, since he had a greater number of pounds in proportion to

value, than did Forsyth. If the firm had packed no raisins except those of the two partners, and it had been agreed that the surplus of one over the other should be packed at cost, it would scarcely be contended that it would not be a fair adjustment of the expense to make the one having the surplus pay such proportion of the general firm expenses as the value of his surplus bore to the value of the total quantity, leaving the balance of such general expenses to be borne equally. This, in substance, was accomplished by the plan adopted by the referee. If Butler were not made to pay this proportion of the general expense, he would obtain the services of the firm in disposing of his surplus and escape payment of his just part of the services which he agreed to pay.

There is no double charge in this plan of settling the account. In the matter of this charge Butler stands to the firm, not as a partner, but as a customer or patron. The amount he is thus made to pay goes into the firm account as part of the receipts and to that extent increases the profits, of which Butler receives one half. The same items of expense which are taken in computing his proper percentages, of course, appear again in the statement of the firm account, but this is in no sense a double charge to him.

The firm carried on seven packing houses, and the raisins of the two partners were all packed at the Fresno house. All the raisins of all the houses were taken into account in ascertaining this percentage of the general expense to the gross value of the entire pack, the expenses considered being for the general benefit of them all. It is earnestly insisted that this calculation should have been confined to the expense of the Fresno house alone. This was done, so far as the expenses in that house could be separated. With respect to the expenses common to all, the point is wholly immaterial. It could have been ascertained in the way contended for by first ascertaining what portion of the general and common expense was properly chargeable to the Fresno house and, with that included, computing Butler's percentage on account of the surplus with reference to the output and expense of the Fresno house as thus increased. The result would have been the same.

Soon after the firm began business Forsyth and Butler each began to draw from the firm large sums of money for individ-

CLII Cal.—26

ual use. The partnership articles provided that each should
contribute equally to the capital and share equally in the
profits, that it was to continue for one year, ending April 16,
1895, and that, until the termination of the year, neither
partner should draw from the funds of the firm any money
for individual use, except the proceeds of his individual
raisins delivered by him to the firm to be packed and sold.,
It further provided that an accounting should be had at the
end of the year and each should then be allowed to draw his
share of the profits. No such accounting was ever made, but
it does not appear to have been due more to the negligence or
fault of Butler than of Forsyth that it was not done. The
referee took March 10, 1897, as a proper date for balancing
the account. He charged each partner with interest on the
respective sums drawn by him from the firm, from the date
on which it was drawn up to March 10, 1897, and from that
date to June 2, 1898, which was the time of the trial. Butler's
interest charge was $2875.19 and Forsyth's $2069.38, the
excess against Butler being $805.81. The firm made a profit,
computed by the referee at $23,024.55, which was equally
divided in the statement of the account. The interest all went
into the profits, and hence, Butler obtained a return of one
half of the excess of interest charged against him over that
charged to Forsyth. If the interest charge is improper,
Butler is injured to the extent of one half of this excess,
that is, in the sum of $402.95. The referee found that Butler
still owed the firm the sum of $1818.74, and accordingly gave
judgment against him in favor of Forsyth for one half that
sum, or $909.37, to settle the account, which, of course, in-
cluded this $402.95, charged for interest.

Appellant claims that a charge of interest was improper,
under the evidence. The statement bears many indications of
omissions of parts of the evidence which would probably
throw light upon the question of interest. As it stands, we
are unable to find sufficient evidence to justify a charge of
interest to either partner. The rule concerning interest for
moneys drawn from the firm for individual use by the part-
ners is thus stated in Lindley on Partnership (p. 391):
"Inasmuch as what is fair for one partner is so for another
and the firm, when debtor, is charged with interest, it seems
to follow that if one partner is indebted to the firm, either

in respect of money borrowed, or in respect of balances in his hands, he ought to be charged with interest on the amount so owing, even though on the balance of the whole account a sum might be due him.  Except, however, where there has been a fraudulent retention, or an improper application, of money of the firm, it is not the practice of the court to charge a partner with interest on money of the firm in his hands; for example, under ordinary circumstances, a partner is not charged with interest on sums drawn out by him, or advanced to him.''

There is no evidence that Butler fraudulently retained money of the firm.  So far as the evidence indicates anything on the subject, it seems to be the fact that each partner drew approximately enough money from the firm funds to pay what was or would be owing to him on account of his crop of raisins and the balance due him on account of his half of the profits and that, presumably by inadvertence, the account not having been stated, Butler drew about one thousand dollars more than his proper share.  If this is the true condition of the account, Butler should be charged with interest on the overdraft from the time he drew it down to the time of settlement.  But this would not require any charge to Forsyth, nor would it account for the large amount charged to Butler for interest, an amount more than double his overdraft.  Butler had charge of the books of the firm and it was his duty to attend to the bookkeeping.  He could not excuse the overdraft by the fact that the account had not been stated.  It was his duty to state the account, or show good reason for his inability to do so.  Hence he should pay interest on the overdraft.

Nor is there any substantial evidence of an improper application of the money drawn.  The articles forbid the drawing of money by either partner during the year, and if it had been drawn without other reason than the fact of his being a partner, there would have been an improper application of firm money by each partner.  But in addition to being a partner, each member of the firm stood in the relation of a patron of the firm.  Each sold to the firm a large quantity of raisins which the firm packed and sold for his account, the proceeds of which would be owing to him as soon as sales were made and would be due as soon as, under the growers'

agreement, settlement was to be made. It seems that, for the most part, the money was drawn against this packing account and that it was in the nature of an advancement by the firm to the grower on account of the crop received. It was the custom of the firm to make such advancements to the other growers whose raisins it packed and it is to be inferred, in the absence of anything to the contrary, that these sums drawn by the partners, respectively, were for the same purpose. It may be that it was the custom to charge the grower interest upon these advances until the end of the year when a settlement was to be made with them. If so, it would be proper to charge like interest to each of the partners for the same period. But as settlement was due in April, 1895, so far as appears (the record does not satisfactorily show when the raisins packed by the firm were sold), and as it was the duty of the firm to make settlement promptly, no interest could justly be charged after a settlement was due for the raisins sold. The evidence, however, does not show whether it was, or was not, the custom to charge interest upon advances to customers. So, also, if it had been proven that the firm borrowed money with which to carry on its business and was paying interest thereon at the time of these advances, then, of course, each partner should be required to pay interest on sums drawn out by him as a partner from the time of drawing until the money became properly payable to him on final settlement, or on striking a balance of profits. The fact that the partnership agreement shows that the firm had made provision for borrowing money, and the fact that money seems to have been drawn out before it would seem possible that any sales could have been made whereby money could have been received from that source, all indicate that money may have been borrowed, but still there is no evidence that money actually was borrowed, and the money drawn may have been previously paid in by the partners. Each partner became entitled to the money drawn as advances on the crop, as soon as a settlement was due after the raisins were all sold, and no interest should have been charged on the advances after that time. The interest was computed for more than three years instead of only for a part of one year as would have been the case in the event stated. Both were evidently drawing against both the profits and the amounts due them from

the firm for raisins sold. Butler had by far the largest crop and accordingly drew the most money. The charge of interest against him is consequently greater than that against Forsyth. He could not complain of this difference so long as interest was justly chargeable to him under an agreement to pay interest on advances. But the continuance of the interest after his money was due him would be an injustice to him to that extent.

We are unable to make any proper adjustment of this matter as the record stands. It will be necessary to retry this issue. Evidently this was not considered an important question upon this appeal. Indeed, we had some doubts whether it could be considered at all upon the record presented. The motion for a new trial was made upon the minutes of the court and was denied on December 17, 1900. The notice of motion contained voluminous specifications as to the insufficiency of the evidence. There is nothing in the record to show whether any, or, if any, which, of the grounds of the motion mentioned in the notice of intention were "argued before the court for a new trial." (See Code Civ. Proc., sec. 661.) Ordinarily, it would perhaps be presumed that the grounds mentioned in the minute order were all argued. There would be no doubt of this in the present case were it not for the fact that the statement on appeal, settled in December, 1902, two years after the motion was denied, does not anywhere state, or imply, that it contains all the evidence pertaining to all the grounds argued before the court, or relating to the specifications set forth in the notice of intention, but on the subject of what evidence is included therein contains this statement only: "The foregoing is the substance of the testimony in relation to the grading, classification and quality of the raisins received and packed at the Fresno packing house of Butler & Forsyth during the season of 1894, including the raisins delivered by the firm of Butler & Forsyth." There are many things to indicate that nothing else was intended to be included. The respondent does not raise the objection and because of his acquiescence we have resolved the doubt in favor of the appellant. But under all these circumstances and others which we have not stated, we think the appellant should not recover the costs of appeal. The case is in equity and costs are discretionary both in the trial court and in the appellate court.

We do not consider it necessary to notice the errors of law urged so very briefly by the appellant. None of them affect the merits of the case. The rulings were either correct or harmless.

It is ordered that the judgment, to the amount of $506.42, be affirmed, that it be reversed as to the excess over that amount, that the order denying the motion for new trial be affirmed, except as to the question of the charges of interest to the respective partners in the statement of the account between them, that as to that issue the order be reversed and the cause remanded to the court below for trial of that issue alone, and that the superior court proceed to take such further evidence as may be necessary and as may be offered upon the issue aforesaid and determine, in accordance with this opinion, the proper charges on account of such interest and render an additional judgment accordingly, and that neither party recover of the other his costs upon this appeal.

Sloss, J., Lorigan, J., McFarland, J., and Henshaw, J., concurred.

Rehearing denied.