[Civ. No. 24619. Second Dist., Div. One. Mar. 16, 1961.]

GLADYS MASHON, as Executrix, etc., Plaintiff; LEE COMBS, as Executor, etc. (Substituted Plaintiff), Respondent, v. T. J. HADDOCK et al., Appellants.

[Civ. No. 24620. Second Dist., Div. One. Mar. 16, 1961.]

O. C. KETTERING, Plaintiff; LEE COMBS et al., as Co-executors, etc. (Substituted Plaintiffs), Respondents, v. T. J. HADDOCK et al., Appellants.

156

Kindel & Anderson, Ernest J. Zack, David E. Agnew and Paul L. Freese for Appellants.

Lee Combs for Respondents.

DRAPEAU, J. pro tem.*—In 1930, J. E. Haddock, Sr., organized J. E. Haddock, Limited, a California corporation. The corporation was a licensed contractor, engaged in the general construction business. It made a great success, building freeways, highways, and bridges.

After the death of the senior Haddock and his wife, all of the stock in the corporation passed to their two sons, T. J. Haddock and J. E. Haddock. The Haddock brothers and their corporation, J. E. Haddock, Limited, are the principal defendants in these cases. When we say in this opinion "the Haddocks" we mean the two brothers and their corporation.

In 1945, the Haddock brothers organized a limited partnership, consisting of themselves as general partners, and several of their employees as limited partners. Among the limited partners were two employees, Gower Mashon and Otis Kettering. Their representatives are carrying on these cases as parties plaintiff.

The certificate of limited partnership gave exclusive power of control and management to the Haddock brothers.

There were other limited partners, but Mr. Mashon and Mr. Kettering acquired their interests, and they are not in these cases.

For the purposes of this opinion, the percentages owned by the partners were:

| | |
|---|---|
| T. J. Haddock | 36 per cent |
| J. E. Haddock | 36 per cent |
| Gower Mashon | 15 per cent |
| Otis Kettering | 13 per cent |

They named the partnership Haddock Company; but to clearly distinguish it from other Haddock enterprises of similar name, we will refer to it as "the partnership."

Mr. Mashon was an able general construction superintend-

---

*Assigned by Chairman of Judicial Council.

ent. He had worked for the Haddocks since 1934 and had attained a position of major executive responsibility with them.

The Haddocks had a contract to build floating drydocks for the United States Navy, at a cost running into millions of dollars. They decided to turn this contract over to the partnership, to give the limited partners a share in profits. This they thought desirable because with wartime stabilization regulation of wages it would tend to keep key employees with their organization.

The four men undertook other projects in addition to projects of the partnership.

These other projects were joint ventures, clothed in corporate form, generally owned 50 per cent by the Haddock brothers and 25 per cent each by Mr. Mashon and Mr. Kettering.

The partnership and the several joint ventures have at times been referred to in the briefs collectively as the joint venture. We use that term too, although it is not precisely correct. What we have here is a limited partnership and a series of joint ventures, with an accounting for the whole thing.

Mr. Kettering was office manager for the Haddocks, and it was a purpose of the partnership to keep him with their organization and to give him too a share in profits.

The partnership lasted a little over three years, beginning March 1, 1945. By its articles of copartnership it was to end February 28, 1948. Apparently by mutual consent it continued until by agreement of all the partners it was deemed dissolved as of November 30, 1948.

The Haddocks took over the partnership assets and completed its unfinished contracts. They also took over all the joint venture projects.

Gower Mashon died February 25, 1949.

His widow, Gladys Mashon, individually, and as executrix, brought her action July 23, 1952, against the Haddock brothers, J. E. Haddock, Limited, and joint venture corporations hereinafter named. She asked the court to determine what was due to her and her husband from his interest in the partnership and in the joint venture corporations, and for money due him and her on three promissory notes.

Just before the argument in the District Court of Appeal (December 1960), Mrs. Mashon died, and her executor goes on as plaintiff in her place.

Otis Kettering brought his action against the same defendants December 18, 1954. He sought an accounting and judg-

ment for his share of the partnership assets and profits and in the joint venture corporations.

In addition he alleged fraud and deceit that induced him to enter into an agreement with the Haddock brothers, conveying to them for cash, and for other considerations, all of his right, title, and interest in and to all of the property of the partnership, and in and to all of the corporations. Other considerations mentioned were the assumption by the Haddocks of certain liabilities of the partnership, and a promise to hold him harmless from possible liabilities.

Mr. Kettering died before the last trial of these cases, and his case is being carried on by his widow as executrix, together with a coexecutor.

The cases were first tried by Honorable Clarence D. Runkle, Judge of the Superior Court of Los Angeles County.

Before the first trial, Judge Runkle granted a motion to join Mr. Kettering as plaintiff in the Mashon case, and to join Gladys Mashon as plaintiff in the Kettering case.

The plaintiffs and defendants stipulated that evidence already in the Mashon case would be considered in the Kettering case, and that evidence thereafter received would apply to both cases. Then by stipulation the two cases were ordered consolidated for trial.

Judge Runkle filed a memorandum of decision June 19, 1958, but died before making findings or judgment.

Mistrial was declared October 30, 1958.

Judge William J. Palmer retried the cases February 16, 1959.

Separate findings of fact and separate judgments were made in each case.

Expressed in figures, the judgments were as follows:

For Mr. Mashon $143,141.14 and $81,169.63 interest. This included the amount due on one promissory note, principal, interest, and attorneys' fees.

For Mrs. Mashon $25,933.33 on two joint tenancy promissory notes, with interest $9,755.37.

For Mr. Kettering $11,000 and interest $3,460.72.

The Mashon judgment also provided for an interlocutory partition sale and accounting for one of the joint ventures, Industrial Sites, a corporation.

The Haddocks, their corporation, J. E. Haddock, Limited, the joint venture corporations, and the partnership (Haddock Company) appeal from the Mashon judgment.

The same defendants appeal from the judgment in the Kettering case.

## Activities of the Joint Venture

Two floating drydocks were built by the partnership, with a profit of approximately $700,000. The partnership had also a number of other profitable contracts.

Mr. Mashon and Mr. Kettering took an active part in the management of the joint venture enterprises, and in the partnership. There was trust and confidence among all four of these gentlemen, and they conducted their business affairs with astonishing informality and generally by verbal agreements.

But when one of their ventures made a serious loss, the partners' relations cooled. Mr. Mashon thought they should get Mr. Kettering out. The Haddock brothers agreed.

Mr. Kettering lost his health, and sold out. He said in his deposition that he had been told by the Haddocks' auditor that he would be accounted out, and had better take what he could get.

Suddenly and without warning, Mr. Mashon died, and his widow never could come to any agreement with the Haddocks in settlement of her husband's relations with them in the joint venture.

The results brought tragedy to all. Mr. Kettering hung around the Haddocks' offices, like Banquo's ghost, trying to get money due him on his contract of sale. He said he "had to beg for every dime" he got.

Without a settlement of her claims, Mrs. Mashon spent the last years of her life, penniless, helped by the charity of her friends.

As stated, the joint venture projects were carried on by several corporations. Among these are the defendants Pacific Weather Seal Co., Inc., J. D. Speer, Inc., Marine View, Inc., Marine View II, and Industrial Sites, Inc.

J. E. Haddock, Limited, was the agency solely of the Haddock brothers. It participated in the affairs of the partnership and of the joint venture corporations at their direction. It carried on also extensive other business of the brothers.

All of the corporations, like the partnership, were under the direction and control of the Haddock brothers. They were the dominating personalities.

Marine View was a housing project in San Pedro that made

a bad loss. The four men purchased the land, and took title to it as tenants in common, with one-quarter interests each.

During the progress of the improvements they organized two corporations, Marine View, Inc., and Marine View II, to carry on the work. They conveyed title to the land to Marine View II, and took stock in it, 50 per cent in the Haddock brothers and 25 per cent each in Mr. Mashon and Mr. Kettering.

Streets and utilities (referred to in the record as offsite improvements) were made by the partnership and J. E. Haddock, Inc. Costs ran high.

The buildings were completed about the time the partnership was dissolved. The venture was financially badly in the red. The Second World War had ended, with a consequent drop in housing demand. Finally the whole thing was lost by foreclosure in 1949.

Other of the joint venture corporations are referred to later in this opinion.

### The Gravamen of Plaintiffs' Cases

During the existence of the partnership and after its termination, expensive machinery and material were transferred from one to another of the corporations and the partnership, including J. E. Haddock, Inc. Many transfers were made "without charge." That is to say, no charge was made on the books of the transferee in favor of the owner of the machinery or of the material.

Thus any one of the corporations, or the partnership, could be made bankrupt at the will of the Haddock brothers by bookkeeping entries that they alone had the power to direct.

Also there was a practice of charging equipment rentals by one entity against another, and sometimes exorbitant rentals were charged.

And also the Haddock brothers withdrew from the partnership profits in excess of profits due the limited partners.

Mr. Kettering alleged in his complaint that these transfers and charges were first made to minimize income taxes, and were later corrupted to bankrupt the partnership, and to thus make his interest in it valueless.

The Mashon complaint alleged that they were made to cheat him out of what was due him as a limited partner and joint adventurer.

Other allegations in the Mashon complaint have to do with recovery on three promissory notes, to be later referred to.

### The Accounting Problem

These two actions presented a most difficult and complex accounting to the trial court. It was and it is a veritable accountant's nightmare. In order to determine the net worth of the partnership, its profits, and the rights of plaintiffs in the joint venture corporations, the trial judge had to make the best accounting he could for the partnership and the corporations, their relations *inter se,* and with the Haddocks.

Moreover, the final inventory of the partnership, the necessary foundation for any accounting of its transactions, taken over by the Haddock brothers on its termination, was never produced. True, witnesses for the Haddocks testified that this inventory, called "the long inventory," could not be found. But witnesses for the plaintiffs testified that it was in the files when the Haddocks took over the partnership.

The trial judge took the latter view of this dispute, and under the substantial evidence rule in appellate practice, this court can not say that that view is not supported by the evidence.

### THE MASHON CASE

#### Findings

We do not attempt to epitomize all of the findings upon which the judgment in the Mashon case is based. Such as are stated are for the purpose of making clear the conclusions of this court.

With this understanding, the trial court found:

1. That the Haddocks, Mr. Mashon, and Mr. Kettering were joint adventurers, operating in their individual capacities and through the Haddock corporations and the partnership, and that the Haddocks at all times exercised sole control and management of the business operations of the whole venture.

2. That the Haddocks charged excessive equipment rentals, and took over quantities of machinery and materials without paying for them; also that they took profits of the partnership.

3. That when the partnership terminated the Haddocks took over its assets, and were charged with the duty as trustees to wind up its affairs, and to account to Mr. Mashon for his interest in it.

4. That after the partnership was terminated the Haddocks completed three of its unfinished jobs, upon which they made a profit for which they should account.

5. That Mr. Mashon owned 20 per cent in J. D. Speer, Inc. That the Haddocks took over all of the assets of that corpora-

tion, and Mr. Mashon was entitled to 20 per cent of surplus and earnings shown on a balance sheet of the corporation dated July 21, 1949.

6. That Mr. Mashon was entitled to damages for the Haddocks' failure to promptly render an accounting.

7. That the Haddocks were liable for principal, interest at 4 per cent per annum, and attorneys' fees, on three promissory notes, one payable to Mr. Mashon, and two to him and his wife as joint tenants, with a credit of $6,400 paid on account. That these notes were made in consideration of money advanced by Mr. Mashon upon the promise of Mr. T. J. Haddock that he and his brother and his corporation, J. E. Haddock, Limited, would pay them. That while the notes were executed by one of the Haddock corporations, Marine View II, "the circumstances under which said loans were made were such as to make the Haddocks the principal debtors in respect to the repayment of same, and to make the obligations represented by the notes the original obligations of the Haddocks . . . and were one incident in a total joint venture of Mashon, the Haddocks and Kettering, activated through the several business vehicles hereinabove mentioned."

8. That there should be an interlocutory judgment with respect to Industrial Sites, Inc., that the corporation was an agency of the joint venture, holding legal title to improved real property; that "piercing the corporate veil" the Haddocks owned a three-fourths interest in the real property, as tenants in common with Mr. Mashon, who owned the remaining one-fourth interest; that the interlocutory judgment should appoint a referee with instructions to make an accounting of transactions between the Haddocks and the corporation (The Haddocks had rented and managed the property, and used it themselves from June 1, 1955, to July 6, 1959. The court directed that the Haddocks be charged $500 a month rent for the time they used it.), to marshal its assets, determine its liabilities, sell the property, and pay one-fourth of the remaining balance, if any, to Mr. Mashon's executrix and three-fourths to the Haddocks.

### The Grounds of Appeal

Appellants' brief contains 38 specifications of error.

Obviously, within limits of length of any judicial opinion. a reviewing court may not quote so many specifications in full. The best we can do will be to set them out in groupings, and dispose of them in that order.

Before doing that, however, we desire to stress two fundamental principles of law that govern this court in passing upon many of appellants' points on appeal, and to which we shall refer as we go along.

These are:

The substantial evidence rule; and

The duties of trustees in cases like these.

### The Substantial Evidence Rule

This rule has been stated time and again by the courts of California.

■■ The power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding. ■ And when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. (*Brewer* v. *Simpson*, 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289]; *Grainger* v. *Antovan*, 48 Cal.2d 805 [313 P.2d 848]; *Guerin* v. *Guerin*, 152 Cal.App.2d 696 [313 P.2d 902]; *Ortega* v. *Ortega*, 118 Cal.App.2d 589 [258 P.2d 594].)

Where different conclusions may reasonably be drawn from the evidence by different minds, the findings of the trial court will not be disturbed. (*Pfingsten* v. *Westenhaver*, 39 Cal.2d 12 [244 P.2d 395].)

■ It is the duty of a reviewing court to view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the party who was successful in the lower court. (*Ducharme* v. *Ducharme*, 152 Cal.App.2d 189 [313 P.2d 33].)

This rule has been set forth more at length than usual, because it has colored many of our statements of fact in this opinion. If the trial court's findings on conflicting testimony had been the other way, we would have had to state them that other way.

### The Haddocks' Fiduciary Obligations

Section 15021 of the Corporations Code provides: "(1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

■ The rights and liabilities of joint adventurers as between themselves are governed by the same rules and prin-

ciples that apply to partnerships, and the relationship between joint adventurers is of a fiduciary character. (*Zeibak* v. *Nasser*, 12 Cal.2d 1 [82 P.2d 375]; *Jaffe* v. *Heffner*, 173 Cal.App. 2d 512 [343 P.2d 374].)

 As liquidating members of the joint venture corporations and of the partnership the Haddocks were trustees for Mr. Mashon and Mr. Kettering. The rules of partnership accounting apply to every part of the joint venture, including the partnership. The Haddocks were bound to act in the highest good faith. (*Prince* v. *Harting*, 177 Cal.App.2d 720, at p. 727 [2 Cal.Rptr. 545].)

 The burden of establishing the account is on the trustee, including the burden of showing that any expenditure made was a proper disbursement. (*Purdy* v. *Johnson*, 174 Cal. 521 [163 P. 893]; 49 Cal.Jur.2d, p. 160.)

In the recent case of *Laux* v. *Freed*, 53 Cal.2d 512 [2 Cal. Rptr. 265, 348 P.2d 873], our Supreme Court states the rule as follows:

 "Manifestly, as partners . . . plaintiff and defendant bore a confidential and fiduciary relationship to each other. [Citing cases and authorities.] As partners, neither had the right to take an unfair advantage or secure an undue benefit, and the burden is on the one seeking an advantage to show complete good faith and fairness toward the other. The duty of good faith and the burden of showing it extend to the dissolution and liquidation of partnership affairs, as well as to the sale by one partner to another of his interest in the partnership. [Citing cases and authorities.]" [P. 522.]

### Asserted Errors as to Findings

Appellants contend:

a. That additional findings are required relative to liabilities of the joint venture for offsite improvements on the Marine View apartment house project.

b. Also relative to Pacific Weather Seal, Inc.

c. Also relative to identity, ownership, and value of material and equipment of the partnership for which appellants were liable to account.

d. Also profits made on three unfinished jobs of the partnership completed by the Haddocks.

e. And also findings requested after the court's notice of decision, but not given.

Complaints as to insufficient, incomplete, required, or improper findings are made all through appellants' brief, but it hardly seems necessary to set them all out here.

Suffice it to say that, comparing the findings with the evidence compels the conclusion that (with two exceptions, interest and damages, hereinafter referred to) the findings are sufficient to support the judgment, without the additional findings for which appellants contend; that the evidence supports the findings; and that there are no errors with respect to findings.

When findings are questioned, it is the duty of an appellate court to compare them with all the evidence in the case, to consider them as a whole, and to construe them liberally in support of the judgment.

In *Brewer* v. *Simpson*, 53 Cal.2d 567, at page 583 [349 P.2d 289, 2 Cal.Rptr. 609], the Supreme Court of California reaffirms and quotes the long-established principle stated in *Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689], as follows:

''Appellate courts . . . if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical.''

And again in *Burke* v. *Chrostowski*, 46 Cal.2d 444 [296 P.2d 545], (a partnership accounting case) our Supreme Court says:

''In determining this question (findings) it is well settled that 'an appellate court must accept as true all evidence tending to establish the correctness of the finding[s] as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is . . . to be resolved in favor of the findings.' [Citing cases.]'' [P. 445.]

Counsel for appellants argue that the Mashon case should be reversed because they moved the court for additional findings on several phases of the accounting, and the court's rulings denying these motions were contrary to section 634 of the Code of Civil Procedure, as amended in 1959.

We do not think this code section as amended changes in any respect the basic rules as to findings that we have set forth.

### Asserted Errors in Admission of Evidence

Appellants object to evidence of the long inventory on the grounds:

a. That it was not made in the ordinary course of business.

b. That the entries were self-serving.

c. That in any event witnesses if called could not testify as to its contents.

d. That secondary evidence was not admissible.

The warehouse man for the partnership (Kvam) testified by deposition that Mr. Kettering and Mr. Mashon directed him to take the long inventory; that it was for the purpose of dissolving the partnership.

That it was a thorough and complete inventory of all the partnership property; that it took four weeks to make it in November-December of 1948; it was a tremendous job, participated in by all of the employees in the yard. That there were 40 or 50 typewritten pages in the inventory, and the witness put it in a file in the office of the partnership.

And that the value of the property inventoried was roughly from $400,000 to $500,000.

Other witnesses place its value at from $400,000 to $500,000.

Defendants' books reflect a partnership inventory with a value of $23,948.75, later raised to $27,122.51. But no serious contention has been made that it was the complete and final inventory.

Without laboring with the subject any further, we may say that the evidence supports the trial court's finding that there was a long inventory that was suppressed by the Haddocks; that it was made in the ordinary course of business, and was therefore admissible in evidence if it could have been found; and that it was not error to admit secondary evidence of its contents.

*Defendants' Motion for Reference*

Appellants contend that it was an abuse of discretion to deny their motion for a reference under section 639 of the Code of Civil Procedure.

The motion was made after notice of decision and before findings.

This contention is readily answered by reading the code section itself. Subdivision 2 in part provides: ''[w]hen the taking of an account is necessary for the information of the court before judgment.''

The trial judge was of the opinion that all the evidence necessary for decision of the case was already in the record. From our review of the record we concur in that opinion, and find no abuse of discretion in the ruling.

 A motion for a reference is addressed to the sound discretion of the trial court, and will not be disturbed on appeal unless there is abuse of discretion. (*Reed* v. *Reed,* 118 Cal.App.2d 399 [257 P.2d 1002].)

## Award of Profits

 Under this heading appellants predicate the following errors in accounting:

a. In computing profits made on three of the partnership jobs after its termination, it is argued that the trial judge's award did not take into account losses on other jobs from February 1, 1948, to November 30, 1948.

b. That the Normandie-Santa Monica bridge job did not belong to the partnership.

c. Complaint is made that the trial court in the instance of the Oro Grande contracts did not take into account expenses of upkeep of the Haddock buildings, rental and maintenance of the Industrial Sites yard, or compensation to the liquidating partners.

d. In any event, they argue that the partnership had no right to share in profits on jobs after November 30, 1948.

e. There was no evidentiary support for the finding that profits made on these three jobs were partnership profits.

f. It was error to award Mashon profits in the partnership after dissolution.

g. It was error to award accrued profit of the partnership from its beginning to January 31, 1948, and not to award accrued profit from the beginning to the date of dissolution.

h. It was error not to take an account as to the liquidation period of the partnership during which two of the uncompleted jobs were finished.

Reflection compels the conclusion that every one of these items present a problem in detailed accounting.

It is not the function of this court to make a new accounting for the parties in these cases.

When we determine, as we have, that there is substantial evidence in the record that supports the trial judge's accounting we have performed our full duty.

For example, plaintiffs' accountant's report (Exhibit 167) refutes appellants' contention that the evidence does not support the finding that the three unfinished jobs were partnership jobs. Exhibit 167 is a recapitulation of the testimony of plaintiffs' certified public accountant, reached from his examination of the books and records of J. E. Haddock,

Limited, the joint venture corporations, and the partnership. This testimony amply supports the trial judge's accounting. And there is no merit in the argument that this exhibit, or any part of it, or the accountant's testimony, was not admissible in evidence.

These assertions of error lose much of their force and cogency when we bear in mind that the Haddocks were liquidating partners and trustees, with the same relationship of trust and confidence that they had with the limited partners during the life of the partnership and the joint ventures; that they had exclusive possession of all of the records of the partnership and of the joint venture corporations; that they were in duty bound to make a full, fair, and true accounting of the whole venture, and had full opportunity to do so in the superior court.

For a further example: Plaintiffs' accountant tried to get the material control inventories at the J. E. Haddock, Limited, lot. These would have afforded a positive check of the long inventory, and of the inventories of the joint venture corporations. He talked with the auditor and assistant secretary of J. E. Haddock, Limited. His testimony in this respect is illuminating:

"THE WITNESS: Well, I asked him what accounting records they had maintained, because George Kvam's testimony or his deposition stated that he kept the material control records, in which he showed the quantities of all the lumber and the stakes and the nails and so on.

"So I asked him, well, now, where are those material control records that he said he kept. Mr. Salkeld said, 'Well, I don't know where they are.'

"I said, 'Well, let's see if we can find them.'

"Then I said, 'Now, on the same subject, let's look and see if we can find J. E. Haddock, Ltd., material control records to show what they had taken over from Haddock Company.'

"We went out and searched through, first, all the files in the office and then we went out to a little store room back in the back of the building and we tore through probably 50 files, 50 drawer files, and finally he said, 'Well, we just must have thrown those away. I simply can't find them.' . . . So it is absolutely standard accounting procedure for any construction company of any size to keep these material control records out in their production control department."

*The Promissory Notes*

There were three promissory notes, one payable to Mr. Mashon, and two to Mr. Mashon and his wife as joint tenants.

The first was for $15,000; the second for $20,000; and the third for $15,000. All were dated in 1948; bore interest at 4 per cent per annum, with an attorneys' fees clause; and were made as the obligation of the corporation Marine View II, as maker.

The answer admitted execution and delivery of the notes, but alleged that the $20,000 note was without consideration.

The trial court found:

1. That the notes were made upon the promise of T. J. Haddock that he personally, or the Haddock enterprises, would pay them, notwithstanding the fact that they were made as obligations of the corporation Marine View II.

2. That the notes were made, executed, and delivered as part of the business of the joint adventurers and that the Haddock brothers personally got some of the money through their corporation J. E. Haddock, Limited.

3. That the Haddock brothers promised and assured Mrs. Mashon that they would see that the notes were paid.

4. That recovery on the notes was not barred by laches or by any statute of limitation, or by the statute of frauds, and that, in any event, the Haddocks were estopped to urge any of these defenses.

Appellants contend:

a. That the notes were barred by the statute of limitations.

b. That the $20,000 note was without consideration.

c. That defendants were not estopped to plead the statute of limitations as a defense to the notes.

d. That the judgment on the notes against J. E. Haddock went beyond the pleadings and is not supported by the findings.

e. That the finding that the Haddocks are liable on the notes is error, because they did not sign them in their individual capacities.

f. Recovery on the $20,000 note was error because the promise to pay it was not in writing.

g. The statute of limitations was not tolled by the absence of the Haddock brothers from the state.

Now let's take a look at the record.

Mr. Kettering testified that he was present at a conversation between Mr. Mashon and Mr. Haddock about the notes. Mr.

Mashon said that he didn't want to loan the money because he had a tax problem facing him after the first of the year. Tom Haddock assured him that he would take care of the taxes and also take care of the notes.

While they were in conference Mr. Mashon called John Haddock on the telephone.

After that conversation Mr. Mashon agreed to loan the money. Marine View was to make the notes, but "it was to be payment guaranteed personally by Tom and John Haddock. He would not accept it otherwise. . . . Mr. Mashon said that absolutely definitely to Tom Haddock."

Tom Haddock said that he and John would definitely take care of it; that it would be their personal note. The three notes were always considered the personal notes of Tom and John Haddock.

T. J. Haddock testified that Mr. Mashon was concerned about getting this money back to pay his income taxes, and that he, T. J. Haddock, said: "Well, go ahead and put it in and if you do get in trouble or do have to have the money, we will have to get it for you somewhere."

And again: "We will take care of this when they come due. Don't worry about that, just put the money in."

An attorney who represented Mrs. Mashon testified that he received the $6,400 paid on account of the notes after a conversation with Tom Haddock in which he told Tom that Mashon had told him that Tom had said that he would see to it that Mashon had the money back before the taxes were due, and that Mashon also said that Tom had told him to take a note against one of the Marine View companies. "That is what I told Tom that George Mashon had told me."

Appellants' argument that this was hearsay is without merit.

J. E. Haddock, Limited, drew $10,000 of the money from the partnership a couple of days after it was paid over by Mr. Mashon.

Now comes the most distressing part of this whole case.

After Mr. Mashon died, Mrs. Mashon wrote T. J. Haddock several letters, none of which were answered.

In one of them she said "Just think what it would mean to me if I had the $45,000 Gower let you have."

In another:

"It seems to me that there is a moral obligation there to at least keep your promise to him and pay the income taxes, at

least the amount left, $11,005.00 federal and the last time I heard about it, $2,095.75 to the state. I don't think you would ever try to deny how much Gower has contributed to your success. He was the most wonderful man and the squarest that ever lived, true blue, loyal and dependable, and he never spared himself, gave his all. Isn't that so? I am going to lay my cards on the table, Tom, and tell you just how I am situated and I am sure you will be able to see the seriousness of it and will be willing to help me. After all, you are the only one who can.

"I have in my account just exactly $15,118.12. If I have to pay $13,000.75 out of that, it will leave me just a little over $2,000, and what is that to go on today. That is why I am so worried about my cash on hand. I have already paid $10,632.09 of this last amount of taxes. Don't you think, Tom, you can help me out with this under all the circumstances? I have a handicap that is really serious. I mean the trouble with my foot and leg from that automobile accident. I do not know what I can do if I should have to go to work. I have a college education but no experience in anything. I have always thought that my interests would work out to a substantial enough estate to keep me. You have a successful business and can expect to make a great deal more money, and on my side, this cash and whatever comes from the other interests in the company is all I have. That is one reason I am so interested and anxious to receive my share of the income from Industrial Sites."

The trial judge summed it all up when he said in his notice of decision:

"It is my belief that Tom Haddock, in that stratum of his person where his best character resides, never has really wanted to repudiate his promise to his trusted friend and useful associate of many years. His belated check to the widow for $6,400.00 was not the sonorous voice of a diaphragmatic benevolence, but rather the squeak of conscience."

 The special defense of the statute of frauds needs brief comment.

Paragraphs (2) and (4) of section 2794 of the Civil Code are pertinent here, and may be paraphrased as follows:

". . . a promise to answer for the obligation of another . . . is deemed an original obligation of the promisor, and need not be in writing." (See 23 Cal.Jur.2d 328-341.)

Equitable estoppel is also present here.

■ "It is well settled that a person by his conduct may be estopped to rely upon [laches or the statute of limitations]. Where the delay in commencing action is induced by the conduct of the defendant it can not be availed of by him as a defense." (*Adams* v. *California Mutual Bldg. & Loan Assn.,* 18 Cal.2d 487 [116 P.2d 75] ; 23 Cal.Jur.2d, § 140, p. 418.)

■ With respect to the tolling of the statute, the trial court found:

1. That Mrs. Mashon, the widow, was inexperienced in business affairs, knew nothing of her husband's business relations with the Haddocks, was unqualified to handle business matters, and had no knowledge of tax, business, and other problems.

2. That the Haddocks did not render her any accounting of the affairs of the joint venture until after she commenced her action in July of 1952.

3. That the Haddocks repeatedly told her they would take care of her well and justly in connection with their accounting.

4. That she relied upon such statements and promises.

5. That Mrs. Mashon's first discovery as to the facts relative to the notes was on or about June 25, 1952, when she brought her action.

We conclude that the judgment on the notes was supported by the findings; that the evidence supports the findings; that recovery on the notes was not barred by laches, the statutes of limitations or frauds, that in any event the Haddocks were estopped to urge any of these special defenses; and that there was no reversible error in connection with that part of the judgment.

### Industrial Sites

■ The court found that each of the four adventurers owned 25 per cent of the land and the improvements on the Industrial Sites corporation.

Appellants argue:

a. That there was no consideration for the transfer to Mr. Mashon.

b. That the fact that he did not sign the Kettering agreements precludes his recovery of his interest in the Industrial Sites property.

c. That title to the buildings did not go to Mr. Mashon with the land.

d. That the trial court was wrong in applying the *alter ego* rule.

e. That it was error to charge the Haddocks for their use and occupancy of the property.

f. That the partition of the Industrial Sites property was beyond the trial court's power, under the pleadings and issues in the case.

Again, the record is clear on this subject.

The four men purchased the land as individuals, at the instruction of Mr. T. J. Haddock, and held title to it as common tenants, each with a one-quarter interest.

Some months after they acquired the land, they conveyed it to Industrial Sites, Inc., and each took 25 per cent of the stock of the corporation.

It was testified that they conveyed title to the land to the corporation to secure "certain tax advantages"; that some of the buildings had been constructed before the corporation was organized; and that Tom said they belonged to each individual. Also that they were carried on the books as a job cost that was distributed to the four individuals in their private accounts.

The substantial evidence rule is pertinent to this phase of the Mashon case. Tried by that rule we are required to sustain the findings.

So far as compensation for the use and occupancy of this property is concerned, the evidence shows that the Haddocks as liquidating trustees used it for their own purposes, and they should pay for it.

We agree with the trial judge that a complete disposition of the Mashon case required the interlocutory judgment as to the Industrial Sites corporation. In the circumstances and equities here under consideration nothing less could have been done.

■■■■ As was said in *Prince* v. *Harting, supra,* 177 Cal. App.2d 720, at pp. 732-733:

" 'Equity does nothing by halves, but gives full relief in such cases. When it undertakes to adjust the differences between partners, it adjusts them all. "The whole subject matter in controversy between the parties, which includes all the partnership transactions of each and all the partners, is the subject of the adjudication, and the account and decree must include all these matters, and leave nothing open for future litigation or controversy. ■■■■ Equity will not adjudicate causes piecemeal." ' [Citing cases.] "

In the recent case of *Chapin* v. *Gritton,* 178 Cal.App.2d 551

[3 Cal.Rptr. 250], it is held that the court has inherent power in an accounting action to award full relief to all parties.

We find no error in the interlocutory judgment for partition and accounting.

### Piercing the Corporate Veil

Appellants argue that neither the pleadings, the proof, nor the findings permit the courts to ignore the corporate form of the corporate defendants.

The trial court found that the corporations were corporate forms through which the business of the joint adventurers was carried on.

The rule to be here used is shortly stated in *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514 [203 P.2d 522]:

"[W]here the recognition of the fiction of separate corporate existence would foster an injustice . . . the courts will refuse to recognize it." [P. 522.]

The defendants themselves treated the corporations as joint ventures. In referring to the Marine View corporations, their own certified public accountant testified:

"Q. Do you recall what those jobs were? A. Those were Marine View I and Marine View II, the construction of the buildings.

"Q. What disposition did you make of the amount of cost representing the contract prices? A. Charged it to the four partners—charged it to accounts receivable, partners."

### J. D. Speer, Inc.

The trial court found that J. D. Speer, Inc., was one of the joint ventures; that Mr. Mashon owned 20 per cent of its stock, and, therefore, was entitled to that proportion of the last known assets of the corporation, $4,995.19, with interest from July 23, 1952.

Appellants contend that J. D. Speer individually was an indispensable party to determine the affairs of the joint venture, at least in respect to the corporation bearing his name, and that it was error to make this portion of the judgment without him in the case.

Disregarding the corporate forms, as the trial court did, the solution of this problem is easy.

The Haddocks appropriated all of the assets of J. D. Speer, Inc. This was evidence of a debit to the Haddocks and a credit to Mr. Mashon in the accounting.

There is no need to enter into a technical discussion of indispensable parties in such a situation as this.

## THE KETTERING CASE

 As stated, Otis Kettering made an agreement with the Haddocks, conveying to them all of his right, title and interest in and to the joint venture corporations, and in and to the property of the partnership.

He alleged in his complaint that he was induced to make this agreement by fraudulent representations of the Haddocks; that when he entered into it he was a sick man; he had had a heart attack, was broke, and didn't know which way to turn financially.

The trial judge held that he could not find fraud inducing the contract because of lack of that clear and convincing evidence required by our law.

It is without dispute that Mr. Kettering was office manager, and knew all about the transactions of the partnership and of the joint venture corporations. Therefore, he had that knowledge of what he was doing when he made the agreement of sale that rules out fraud.

 So only one thing remains to be considered in the Kettering case. Was it error for the trial court to hold that the $11,000 capital that Mr. Kettering put into the partnership was not included in his sale to the Haddocks?

In his memorandum of decision the trial judge said:

"Kettering's right to the return of his capital contribution was his personal property, not the property of the partnership. He did not sell this property to the Haddocks or to the corporation. That he did not do so may have resulted from an oversight on the part of all the persons concerned; but whether or not an oversight occasioned the result, the fact is that title to this property did not pass from him. We have in this case no cause of action, pleaded or proved, for reformation of the sale-and-purchase agreement."

The agreement of sale is to be found in three documents, plaintiffs' Exhibits 145, 146, and 147:

1. Exhibit 145. Agreement on Dissolution of Terminated Partnership.

2. Exhibit 146. Bill of Sale and Agreement for Assumption of Debts.

3. Exhibit 147. Purchase and Sale Agreement of Rights Contained in Agreement Relating to Dissolution of Partnership.

Exhibit 145 was prepared for the signatures of the four partners. It was signed by the Haddock brothers and Mr. Kettering. It was not signed by Mr. Mashon.

Exhibit 146 was a bill of sale by the four partners to J. E. Haddock, Ltd., also signed by the Haddock brothers and Mr. Kettering; not signed by Mr. Mashon.

The property conveyed was described as "all the property of said partnership," excepting machinery and equipment, motor vehicles, and office furniture.

Exhibit 147 was the Kettering sales agreement to the Haddock brothers, signed by him and his wife, not prepared for Mr. Mashon's signature.

Consideration stated was $29,620.62.

The words of conveyance were "sell, assign, transfer, grant and convey . . . all my right, title, and interest in and to the following property."

The property described was Mr. Kettering's stock in the joint venture corporations, a parcel of real property, and

"That certain agreement on Dissolution of Terminated Partnership, etc." (Exhibit 145.)

This brings us back to Exhibit 145, to see if Mr. Kettering's capital contribution to the partnership was included in his sale.

Again we find the recital, "have sold . . . all of their right . . . in and to all of the property of the partnership," with certain exceptions.

A fair reading of these three agreements has convinced us that the trial court's construction of them was correct; that the Kettering capital in the partnership was not included in the word "property" used in his agreement of sale.

Appellants contend that in any event the right to recover the capital in the partnership is barred by the statute of limitations. But again we must point out that these cases involve the obligations of trustees. As beneficiary of a continuing trust, the statute did not run in the Kettering case until demand was made upon the trustees and they refused to comply, or otherwise repudiated the trust.

"The obligation of such a trustee to account is a continuing duty and the beneficiary's right to demand an accounting runs with that duty and may be asserted so long as that duty remains unperformed; the trustee's mere failure to account, without more, may not be deemed an entire repudiation of the trust so as to start the statute running." (*Estate of De Laveaga*, 50 Cal.2d 480, at p. 487 [326 P.2d 129].)

Tried by this rule, the statute of limitations does not apply.

### Interest and Damages

There are two elements in these cases that require modification of the judgments.

One is the award of interest in the accounting.

The other is the award of damages in the Mashon case.

 Whether interest shall or shall not be allowed in partnership accounting cases is settled by section 15042 of the Corporations Code.

That section provides that a retiring partner shall at his election receive (a) the value of his interest at the date of dissolution with interest, or (b) in lieu of interest the profits attributable to his right in the property of the dissolved partnership.

This rule was approved and applied by Mr. Chief Justice Gibson, speaking for our Supreme Court, in the recent case of *Casida* v. *Roberts,* 51 Cal.2d 853 [337 P.2d 829].

The Casida case controls the question of interest in this accounting.

There can be no doubt that Mr. Mashon's legal representative elected to take profits of the joint venture after it was terminated. The whole case has been tried upon that theory. (See *Vangel* v. *Vangel,* 45 Cal.2d 804 [291 P.2d 25, 55 A.L.R.2d 1385]; and *Vangel* v. *Vangel,* 51 Cal.2d 510 [334 P.2d 863].)

 While the trial court held in the Kettering case that his contract barred recovery of anything but his capital in the partnership, nevertheless that case was tried upon the same theory as the Mashon case. We must hold that in the Kettering case also there was an election not to take interest.

 As we come to the end of this opinion, let us say in fairness that we do not brand the Haddocks as villains in these cases.

After the death of Mr. Mashon the Haddocks themselves had to deal with this accounting problem. It was one that couldn't be worked out in a day. It took time.

Then they were called upon to defend serious charges of fraud, and a judicial accounting that could have been financially disastrous to them.

Many items in this judicial accounting have been subject to legitimate argument. The trial judge resolved these arguments against the Haddocks, and we have stated the facts in support of that decision favorably to plaintiffs on conflicting evidence, as the law requires us to do.

The Haddocks were generous with their employees in the joint venture. They gave the partnership the Navy drydock contract. They had built the graving basins in which the drydocks were fabricated. They put their capital and machinery and materials behind the Navy contract. Of course they charged the partnership for the use of their property, but without the Haddocks the partnership could never have built the drydocks.

Mr. Mashon's contribution to the partnership capital, $8,500, and Mr. Kettering's $11,000, were infinitesimal compared with the magnitude of the partnership undertakings.

The Haddocks had to take their share of the loss incident to the debacle of the Marine View housing project. Two restaurants that the partnership built also resulted in losses.

The general rule has always been that except where there has been a fraudulent retention or an improper application of money of a partnership, it is not the practice of the courts to charge a partner with interest on money in his hands after dissolution, and under ordinary circumstances a partner is not charged with interest on sums drawn out by him or advanced to him. (*Forsyth* v. *Butler*, 152 Cal. 396 [93 P. 90]; *Freese* v. *Smith*, 114 Cal.App.2d 283 [250 P.2d 261]; 38 Cal. Jur.2d, § 162, p. 135.)

In *Freese* v. *Smith*, *supra*, it is held that in a partnership dissolution the amount due partners does not become settled or determined until the account is stated by the trial court at the end of the trial.

And in the accounting case of *Schmidt* v. *Waterford Winery*, 177 Cal.App.2d 28, at p. 34 [1 Cal.Rptr. 874], it is held that the amount of recovery became certain only when fixed by the judgment, and that interest was not to be allowed prior to the date of the judgment.

This court holds that in the instant cases the date of the judgments is the date of the accounting in all its parts, and that no interest is to be charged before that date, with one exception, viz:

The promissory notes, which, according to their tenor and terms provide for interest at 4 per cent per annum and for attorneys' fees. That part of the judgment will stand.

So far as damages are concerned, it is clear that there was no conduct on the part of the Haddocks for which damages should be assessed.

Damages in such cases as these are in the nature of a penalty. (*Bowman* v. *Carroll*, 120 Cal.App. 309 [7 P.2d 734].)

The Haddocks have insisted upon an accounting by the courts; they have contested every item of that accounting unfavorable to them. At times it has seemed to us that their defenses have had some of the characteristics of a Fabian retreat. But that was their legal right.

These cases have indeed taken a long time, but considering the complexities of the issues and the unfortunate death of Judge Runkle, the Haddocks are not to be singled out as solely responsible for the delay.

The judgments in these two cases will be modified to delete therefrom all interest due Mr. Mashon and Mr. Kettering in the accounting for the partnership and the joint ventures, except interest and attorneys' fees on the promissory notes. And the judgment in the Mashon case will also be modified to strike therefrom all damages.

As so modified, the judgments are affirmed.

Fourt, Acting P. J., and Lillie, J., concurred.

Petitions for a rehearing were denied April 4, 1961, and appellants' petition for a hearing by the Supreme Court was denied May 10, 1961.