[L. A. No. 24160. In Bank. July 3, 1957.]

KYLE Z. GRAINGER, JR., as Trustee, etc., Appellant, v. ALBERT ANTOYAN, Respondent.

[L. A. No. 24446. In Bank. July 3, 1957.]

MAX H. GEWIRTZ et al., as Executors, etc., Appellants, v. SIDNEY MARBACK et al., Defendants; A. L. ANTOYAN, Respondent.

Max H. Gewirtz, in pro. per., Joseph W. Fairfield, Ethelyn F. Black and J. Martin Smith for Appellants.

Stratton & Taylor, Charles C. Stratton, Joseph A. Ball and Ball, Hunt & Hart for Respondent.

McCOMB, J.—These are appeals by (1) plaintiff Kyle Z. Grainger, Jr., as trustee of the estate of Marback Motor Company, a copartnership, bankrupt, and (2) plaintiffs Max H. Gewirtz et al., as executors of the estate of William Gewirtz, deceased, from judgments rendered after trial in favor of defendant. The actions involve a common defendant, common questions of law and fact, and were consolidated for trial.

Both actions were for declaratory relief. The gravamen of the complaint in the main Grainger action and the amended complaint in the Gewirtz action is that on April 9, 1951, defendant became a limited partner in the Marback Motor Company; that while such a limited partner, he received collateral for a purported loan to the partnership in violation of section 15513 of the Corporations Code;* and that despite

---

*Section 15513 of the Corporations Code reads:

"(1) A limited partner may also loan money to and transact other business with the partnership, and, unless he is also a general partner, receive on account of resulting claims against the partnership, with general creditors, a pro rata share of the assets. No limited partner shall in respect to any such claim

the fact that defendant was a limited partner in the partnership he conducted himself as a general partner, thereby making himself liable as a general partner to the creditors of the partnership.

It was alleged in the complaints: "That at all times hereinafter mentioned the defendants Sidney Marback, Phillip Marback and Albert Antoyan, were co-partners, doing business under the fictitious name of Marback Motor Company."

The trial court found, (1) that the foregoing allegation was not true, and (2) that "it is not true that at any time mentioned in the complaint, or at any other time, was the defendant Antoyan a general copartner with Sidney Marback and Phillip Marback doing business under the fictitious name of Marback Motor Company."

This is the sole question necessary for us to determine:

*Was there substantial evidence to sustain the above findings of the trial court?*

*Yes.* This conclusion is governed by these pertinent rules:

■ (1) When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [1] [299 P.2d 231].)

■ (2) When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. (*Primm* v. *Primm, supra,* p. 694 [2].)

■ (3) A limited partner is not liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business. (Corp. Code, § 15507.)

■ Applying the foregoing rules to the instant case, the record discloses that defendant was employed by the firm

"(a) Receive or hold as collateral security any partnership property, or

"(b) Receive from a general partner of the partnership any payment, conveyance, or release from liability, if at the time the assets of the partnership are not sufficient to discharge partnership liabilities to persons not claiming as general or limited partners.

"(2) The receiving of collateral security, or a payment, conveyance, or release in violation of the provisions of paragraph one is a fraud on the creditors of the partnership."

known as Marback Motor Company from November 1, 1948, to approximately April 1952. In 1950 he became sales manager, and as such he sold new cars and, in a limited way, was in charge of the new car selling department. He had an office and a desk and salesmen working under him, but had no authority in respect to employing or discharging personnel. He had no authority in connection with the purchase of new cars. He was told by Mr. Marback what to order, and although on occasions he signed new car orders he always did so on instructions from Mr. Marback.

Defendant had nothing to do with the selling price of cars and was without authority with respect to trade-in allowances to customers purchasing new cars. In such matters he followed a formula prescribed by Mr. Marback to be used in his absence. He never deviated from it without first obtaining the consent of Mr. Marback.

In April 1951 defendant was authorized to cosign checks of the Marback firm with Mr. Marback, Mrs. Marback and Mary Roberts, the office manager. This arrangement was initiated by Mr. Marback for his convenience. The only times defendant cosigned checks were on occasions when Mr. Marback was out of town or indisposed. In such cases he was requested by the office manager to cosign the checks. He never drew any money out of the Marback account on any checks signed by him. He never bought anything and paid for it by the check of the Marback firm. Checks could be drawn on the firm's account without his signature.

Both before and after defendant became sales manager, his authority was so limited as to not permit him any voice in the appraisal of secondhand cars taken in trade, in employing or discharging personnel in the used car department, in the setting of sales prices of used cars, in determining whether the used cars traded in would be sold at wholesale or retail, in passing upon the credit of prospective purchasers, or in determining the terms of conditional sales contracts under which used cars were sold. At no time did the personnel in the used car department take orders from anyone except Mr. Marback.

The office of the Marback firm was managed by Mary Roberts, who employed and discharged all personnel in that department. Defendant had nothing to do with such matters, and had no voice and took no part in the keeping of the books. Mary Roberts approved credit of prospective custo-

mers, and defendant had nothing to do with this. Defendant never gave any orders to the manager of the office department. Miss Roberts looked entirely to Mr. Marback for instructions and orders; she received no instructions from defendant.

The manager of the service department of the Marback firm was Mike Barrows. He had complete authority to employ and discharge personnel in his department. Defendant had no authority in this respect, and Mr. Barrows took no orders or instructions from defendant except in connection with the preparation of automobiles for delivery after sale. Defendant never instructed Mr. Barrows with respect to charges to be made for work done in the service department, credit matters, or the ordering of stocks of parts, which was handled by the parts manager. Mr. Barrows took his orders entirely from Mr. Marback.

There were no changes in the limit of defendant's authority after April 1951. He had no authority in connection with setting of prices for which new cars would be sold. He never hired or fired anyone, did not determine any wages of employees, and had no authority to set prices for repair work. He was never consulted about the quantity of items which were to be stocked and restocked for sale.

Prior to April 19, 1951, Sidney Marback had been operating the firm, known as Marback Motors, which was in the form of a limited partnership, he being the general partner and his son, Philip, the limited partner. On April 9, 1951, Mr. Marback and Philip executed a document entitled "Chattel Mortgage." This document recited that the Marbacks individually and as partners would pay to defendant $50,000 in installments of $750 per month or 10 per cent of the proceeds or profits of the Marback firm, whichever was greater.

On the same day there was executed and delivered a document entitled "Articles of Limited Partnership" by Sidney S. Marback, Philip Marback and defendant. This document provided that defendant, as a second limited partner, would be entitled to a guaranteed payment of $750 per month or 10 per cent of the proceeds or profits of the Marback firm, whichever was greater. The instrument recited that the provisions in respect to the payment of this sum should be read in conjunction with the chattel mortgage executed on April 9, 1951.

A third document was executed on the same day, entitled "Amendment of Certificate of Limited Partnership," reciting

in part that defendant was to be added to the firm of Marback Motor Company as a special limited partner; that the contribution of Philip Marback was $34,740.80; that the amount contributed by defendant was $1,000; and that defendant was to receive 10 per cent of the net profits of the partnership or $750 per month, whichever was greater.

On April 16, 1951, a fourth document was executed by Sidney S. Marback, Philip Marback and defendant, entitled "Agreement Supplementing and Modifying the Limited Partnership." This document recited in part: "It is agreed that Paragraph 9 of the Articles of Limited Partnership wherein the partnership's net profits were to be applied toward the payment of a $50,000.00 indebtedness to the second Limited Partner (Antoyan), upon the satisfaction of the said indebtedness by the Marback Motor Company pursuant to the terms as set forth in Paragraph 9 that the second limited partner hereby agrees to accept 10 per cent per month of the net profits as defined in the Articles of Limited Partnership on the 10th day of each and every month in lieu of the performance of said clause in which payment to the second limited partner was to continue in the same manner after the satisfaction of the indebtedness."

The instrument further provided: "It is mutually agreed that the provision in Paragraph 9 wherein the second limited partner (Antoyan) shall be entitled to a drawing account of $750.00 per month during the continuance of the indebtedness, shall cease upon the satisfaction of the said indebtedness, and in lieu of such terms of payment that the second limited partner shall be entitled to 10% per month of the net profits of the business as set forth in Paragraph 1 of this agreement."

All formal requirements of the California law in respect to the filing and recordation of the foregoing instruments were complied with.

On October 31, 1951, Mr. Marback signed and filed with Pontiac Division of General Motors Corporation a "Dealer's Statement of Ownership of Marback Motor Company." In this statement the $50,000 advanced by defendant to the Marback firm was referred to as follows: "Mr. Antoyan's loan was made to Marback Motor Company. The money was then withdrawn by Mr. Marback and used to make a payment on his 1950 income tax.

"The loan in the amount of $50,000.00, April 9, 1951 to Marback. Motor Company, was secured by a chattel mortgage. . . .

"Amount of funds supplied (a) $45,000.00—See Reverse Side—The original loan was $50,000.00 and through September 30th has been reduced to $45,000.00. Amount or percentage of arrangement for profit sharing (b) None. The loan of $50,000.00 was made by Mr. Antoyan to Marback Motor Company on a non interest basis, and in consideration of the use of the money Mr. Albert Antoyan was made a limited partner with 10% ownership in the business. The debt is to be discharged on a monthly basis at the rate of $750.00 per month or 10% of the net profits before taxes, whichever is greater. Under concurrent agreement Mr. Antoyan was made a limited partner and does not participate in the profits of the business until the aforementioned loan has been paid, and after the payment will remain a 10% owner and receive his share of the profits."

On November 1, 1952, Marback signed and filed with Pontiac Division of General Motors Corporation a "Direct Dealer's Selling Agreement." On the same date he signed and filed with them a "Dealer's Statement of Ownership, Financial Interest and Active Management." In the dealer's agreement appears this recital: "This is a personal contract being entered into in reliance upon and in consideration of the personal qualifications of, and representations in respect thereto, of Sid Marback."

In the dealer's statement of ownership, was this recital: "Albert Antoyan 334 S. Gerhart, Los Angeles, cash loan, chattel mortgage, $37,250.00," and this statement: "See Reverse Side. Original loan of $50,000.00 4-9-51 was made by Antoyan to Marback Motor Co. . . . on 8-31-52 has been reduced to $37,250.00. The loan is on a non interest basis, and in consideration of the use of the money Mr. Albert Antoyan was made a limited partner with 10% interest in the business, the loan to be discharged on a monthly basis at the rate of $750.00 per month or 10% of the net proceeds, whichever is greater. Under the concurrent agreement Mr. Antoyan was made a limited partner and does not participate in the profits of the business until the aforementioned loan has been paid and after the payment will remain a 10% owner and receive his share of the profits."

The $50,000 referred to in the chattel mortgage was received in two payments of $25,000 each. It was recorded in the cash receipts journal of the Marback Motor Company by the office manager and credited to Sidney Marback's personal drawing account.

None of the sum advanced by defendant was ever credited to a capital account of defendant in the records of the Marback firm. This was in accordance with instructions from Mr. Marback.

. The records of the company reflected a payment on this loan of $750 per month, the first payment of $10,000 in May 1951 having been charged to a bonus account. A similar amount was charged to bonus account for the month of June. A $750 payment was charged to the new car salary account for the months of August and September. From October on, $750 per month paid to defendant was charged to a mortgage payable account. Of the $50,000 loaned by defendant, $45,500 was charged to the personal drawing account of Sidney Marback and credited to mortgages payable to defendant.

In April 1952 defendant left the employ of Marback and never returned to work for the firm.

The premises occupied by the Marback firm in the conduct of its business were leased from defendant and his mother. In August 1953 defendant commenced an action against the Marback firm for rent that was in arrears and for cancellation of the lease if the rent was not paid. At this time Marback was also delinquent in the chattel mortgage payments, and defendant served him with a demand for payment and a notice of default. No lawsuit was filed.

About the same time, during July or August 1953, Marback discussed the sale of his business with defendant and with at least one other interested buyer. Defendant refused to buy the entire business, but did agree to purchase some of the assets of Marback Motor Company. In September this transaction was escrowed at a branch of the Bank of America, and notice of intention was duly filed and published. The sale consisted of parts, courtesy cars, a tow truck, and the fixtures, for which defendant paid $50,000. He did not buy all the assets of the firm. He also obtained a new dealer's franchise from General Motors.

Among the assets not included in the transfer from Marback to defendant were petty cash, cash on hand, cash in bank, contracts in transit, customers' notes, receivables and other notes, prepaid taxes, prepaid insurance, prepaid interest, prepaid advertising, and a large portion of leasehold improvements, deposits on contracts and repossession reserves. Customers' notes receivable and customers' accounts not transferred totaled about $40,000; prepaid insurance amounted to

in excess of $1,500; the GMAC reserve account amounted to $27,000. An independent audit made as of August 31, 1953, showed the company had more than sufficient assets to pay all creditors.

The purchase price paid by defendant was determined by an appraisal of the equipment and fixtures, and the inventory price of the parts. The purchase price was paid to creditors of the Marback firm upon instructions from Mr. Marback. It was conceded that the purchase price was the fair market value of the properties purchased by defendant.

On September 23, 1953, defendant obtained from Pontiac Division of General Motors a direct dealer's selling contract, and since that date he has engaged in the business of a new and used car dealer at the address formerly occupied by the Marback firm.

In June 1954 the Marback firm was adjudicated bankrupt.

The foregoing evidence clearly demonstrates that defendant had no control over prices, purchases, the extension of credit, wages, salaries, employment, or the funds of the Marback firm, and that he in fact did not take part in the control of the Marback firm's business. The evidence also demonstrates that there was no activity or action upon the part of defendant that would make him subject to liability under the provisions of section 15513 of the Corporations Code.

The evidence fully sustains the questioned findings of the trial court.

*Holzman* v. *de Escamilla,* 86 Cal.App.2d 858 [195 P.2d 833], relied on by plaintiffs, is factually distinguishable from the instant case, for the reason that in the present case defendant did not exercise control over the partnership, while in the cited case the limited partners in fact exercised control over the partnership. This is pointed out by the court at page 860, where it is said: "The two men [defendants were limited partners] had absolute power to withdraw all the partnership funds in the banks without the knowledge or consent of the general partner. Either Russell or Andrews could take control of the business from de Escamilla by refusing to sign checks for bills contracted by him and thus limit his activities in the management of the business. They required him to resign as manager and selected his successor. They were active in dictating the crops to be planted, some of them against the wish of de Escamilla. This clearly shows they took part in the control of the business of the partnership and thus became liable as general partners."

In view of our conclusions it is unnecessary to discuss other questions argued by counsel.

The judgments are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellants' petition for a rehearing was denied July 31, 1957.