[Civ. No. 32137.   Second Dist., Div. One.   Aug. 5, 1968.]

CHARLES ACH et al., Plaintiffs and Respondents, v. CHARLES FINKELSTEIN et al., Defendants and Appellants.

Drabin & Reese and Earl D. Reese for Defendants and Appellants.

Schullman, Selwyn & Coyle and Herbert E. Selwyn for Plaintiffs and Respondents.

LILLIE, J.—Plaintiffs sued defendants for fraud arising out of the purchase of an apartment house. The cause was heard by the court sitting without a jury. Judgment in the sum of $10,000 was entered for plaintiffs against defendants Charles Finkelstein, Swan Imojean Finkelstein, Dale L. Becker and Vivian M. Becker, and against plaintiffs in favor of defendant B & F Development, Inc. Defendants Finkelstein and Becker appeal from the judgment.

Approximately two years prior to May 7, 1964, plaintiffs, Mr. and Mrs. Ach, had been looking for income property; as the result of a newspaper ad they viewed an apartment building consisting of 27 residential units owned by defendants and located at 8834 Cedros Avenue, Panorama City. The manager, Mrs. Scott, gave them a paper (prospectus) entitled "B & F DEVELOPMENT, INC.; . . ." (Exh. 1) containing information about the property, i.e., income, taxes, lease of the units, etc.; she told Mrs. Ach the apartment "is all filled up and everybody has a one-year lease." After plaintiffs' second visit to the premises, Mrs. Ach telephoned defendant Vivian Becker stating she wished to make an offer.

On the morning of May 7, 1964, by appointment with Mrs. Becker, plaintiffs went to the premises and made an offer of $350,000 to Mr. Becker; later that afternoon, Mr. Becker drove Mrs. Becker, Mr. and Mrs. Ach, and their daughter Rose, to his bank, and they entered escrow. Plaintiffs purchased the building for a total price of $350,000. Part of the

pretrial order are the stipulations that defendants "Charles Finkelstein, Swan Imojean Finkelstein, Dale L. Becker and Vivian M. Becker were the owners of the premises located at 8834 Cedros Avenue, Panorama City, California"; and "That the named defendants through Dale L. Becker and Vivian M. Becker sold the above mentioned property to plaintiffs for $350,000.00." Dale Becker gave information concerning the property to the escrow officer who determined the credit to be given to plaintiffs on cleaning and last month rental deposits under the leases; Mrs. Becker gave the leases to the apartments in the building to the escrow officer who handed them to plaintiffs. Plaintiffs read these leases which set forth on their face that they were executed on the same date as the purported commencement date for the payment of rent. Actually all but one of the tenants had been given two and mostly three months' free rent prior to the date on which the leases were allegedly signed; the leases were in fact signed between two and three months prior to their purported dates of signature.[1]

Concerning the rental concessions given to the tenants and not reflected in the leases, Mrs. Ach repeatedly testified that at no time prior to buying the property or at escrow did she know of the rental concessions, no one told her about them and she did not learn that rental concessions had been given to the tenants by defendants until two months after the close of escrow;[2] that she found out about the rental concessions "two months after [she] moved in" (August 1964), "for the first time two months after escrow closed"; that the first she knew about them was when the tenants asked her about rental

---

[1] At the trial defendant offered the following, and the parties stipulated that ". . . defendants did grant certain concessions prior to the commencement date reflected in these leases, certain free rent concessions to certain tenants in the building that is involved in this litigation, that the records of the defendants do not disclose the length or the amount of these concessions, that they varied, that the longest might have been for 90 days and the shortest, no concession, that their records do not indicate, but further stipulate that on the date that the lease purports that the tenant did pay rent on each and every month as reflected in that lease, that any concessions given by way of free rent were given prior to the commencement date as reflected in any of the leases."

[2] "Q [BY MR. SELWYN]: Now, think very carefully when I ask you this. Did Mr. Becker or Mrs. Becker or the Finkelsteins, or anyone, prior to your going into this escrow, that is, before going into the escrow, tell you that there were rental concessions given by the Beckers to tenants?

"A [MARY ACH]: No. I never know.

"Q Now, at the escrow did anyone ask Mr. or Mrs. Becker or did the discussion about concessions come up?

"A No.

"Q Now, Mrs. Ach, if you had known that there were rental conces-

concessions, "they asked me how much the new rent going to be. I'm not even know what they talking about"; that she bought the apartment building so she could earn a living and analyzed the figures, "the income, the expenses and so on" before she made her offer, at that time believing the figures to be true and relying thereon, she made her offer of $350,000 and thought she could make a living from the building, and had the figures been correct she could have done so but the building is operating at a loss. Asked "Did you know that there were up to three months' rental concessions given at the time you did this figuring as to whether you would make a living?" Mrs. Ach answered, "No"; then, "Did anyone tell you, prior to the close of escrow?", she replied, "No." She further testified that she is not now making a living from the building because when the leases expired the tenants refused to pay the rental set forth in the leases and demanded the same reduction they had previously received from defendants; that finally on the second re-rent, when she found out defendants had given rental concessions, she discovered it was "very hard" to rent the apartments without them and the manager told her she had to give them, otherwise she would be unable to rent the units.

Plaintiffs' daughter Rose testified that she was present at the escrow and no mention was made by anyone of the rental concessions, although she asked Becker if they were 12-month leases and he said yes; there was no discussion relative to how long the tenants had in fact lived in the apartments under the leases; and "There was never any mention of rental concessions or any free rent or anything [like] that mentioned—other than the 12-month lease. That was all that was stated 'This is a 12-month lease.'"

Defendants Becker and Charles Finkelstein testified that they knew that rental concessions had been given to the tenants, in fact, defendants Becker admitted that the leases not showing the concessions were drawn under their instructions; and defendant Finkelstein admitted that he knew the manner in which the leases were drawn. Mrs. Becker testified that in

---

sions given, would you have paid $350,000 for the building?
"A No. I'm not even touch 'em.
"Q When did you first find out about the rental concessions?
"A Two months later.
"Q And did you then consult a Mr. Berry Locke, a lawyer?
"A Yes.
"Q Did you hear from Mr. or Mrs. Becker or Mr. and Mrs. Finkelstein?
"A No."

escrow Mrs. Ach or her daughter asked her husband if any concessions had been given and he said yes, and there "was a very short conversation" about it; Dale Becker testified that Miss or Mrs. Ach asked him if there were any concessions and he replied that yes, concessions were given, but nothing further was said about them—no one asked how many or how much. (The trial judge rejected Dale and Vivian Becker's testimony in this connection.) While it appears that plaintiffs at various times had owned rooming houses and old and smaller apartment houses, first on Alvarado and then on Alexandria, which had been rented on a month-to-month basis, Mrs. Ach repeatedly testified that prior to the sale of the Cedros property they knew nothing about and were never told of the rental concessions given by defendants to the tenants; that she had never given rental concessions in any building she had ever owned; that she had not heard that rental concessions were given in the Valley before she purchased the building; that while she was looking "off and on" for two years for apartments to buy, she did not look in the Valley; and that before she bought the Cedros property she did not know that "there were rental concessions across the street or next door."

The testimony of plaintiffs' witness, Mr. Gee, Department of Water and Power, established the "turn-on" dates of service for all tenants of the Cedros property while defendants owned it; these dates, compared with those given in the leases, show that the tenants took occupancy two and three months prior to the date of the leases. Plaintiffs' witness, Manuel Burnstein, at one time a tenant at 8834 Cedros, testified that prior to renting the apartment he had a conversation with Mr. Scott, the manager; that Scott told him the rent for the apartment was $200 and "you get three months' concession, three months' free rent," and when "you divide the 15 into 12 so that it isn't that much, only comes out to about $165 a month"; that under these conditions he rented the apartment, but he asked Scott, "Well, how about at the end of the 15 months?", and Scott replied, "Well, then you make your own arrangements with the landlord, whoever owns the building at the time." Valerie Sego and Owen P. O'Brien, also previous tenants, testified to the same effect.

The trial court found that with the knowledge of all defendants, Dale Becker gave or caused to be given to plaintiff Mary Ach a group of leases of apartments in the apartment building which set forth on their face they were exe-

cuted on the same date as the purported commencement date for the payment of rent; in fact, all but one of the apartments so rented had been given two and three months' free rent prior to the date on which the leases were allegedly signed, and that the leases were in truth and fact signed between two and there months prior to the purported date of signature; this information was not given to plaintiffs although Dale Becker told them the leases were for twelve months; defendants knew the rentals set forth in the leases based upon a yearly rent were false and misleading, as they did not indicate the fact that rental concessions had been given and they knew that plaintiffs had no information of this fact (Finding No. II). Further, the court found that the representation was made by defendants with the intent to induce plaintiffs to purchase the property (Finding No. III); and that plaintiffs reasonably relied upon such representations and were misled and deceived by them and by defendants' failure to disclose the material fact of the rental concessions, plaintiffs were ignorant of the fact of the rental concessions and had they been informed of them they would not have purchased the property, and by reason thereof they were damaged in the sum of $10,000, the difference between $350,000 paid to defendants and the actual value of the building on the date of purchase, to wit, $340,000 (Finding No. IV).

Appellants' contention, really a claim that the evidence is insufficient to support the findings and judgment, is two-fold—there was no misrepresentation because the leases did not mention the rental concessions given before the term of the leases; and the market value of the property at the time of the purchase was equal to the price paid, thus there was no damage.

On the first issue appellants present a factual argument that (1) plaintiffs were not misled and knew or should have known of the rental concessions based upon Mrs. Ach's testimony that she had owned apartment and rooming houses before and for two years had looked for property to purchase, Finkelstein's testimony that rent concessions were a common practice in the Valley and the Beckers' testimony that Dale Becker mentioned the rental concessions to plaintiffs; (2) defendants Finkelstein had no knowledge that the leases did not show the rent concessions or that the rent concessions were unknown to plaintiffs, based on the fact that Mrs. Finkelstein "was never called to testify" and while she signed the escrow instructions she was never present at any

674

time, and the testimony of Charles Finkelstein conceding that he knew that the rental concessions had been given but denying he knew "whether the leases showed the concessions given"; and (3) there is no showing in the record "that any of the defendants knew that the leases in any way were not proper" based upon their testimony and that of plaintiffs' expert that rental concessions were common to fill up new apartments.

▉ It is for the trier of fact to determine the weight of the evidence and the credibility of the witnesses and resolve all conflicts. Where disputed facts are presented to and resolved by the trial judge, unless clearly erroneous his findings will not be disturbed by the reviewing court; it is not the province of this court to substitute its judgment for that of the trier of fact. ▉ On appeal the evidence and all reasonable inferences to be drawn therefrom must be viewed in a light most favorable to the findings and judgment. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Primm* v. *Primm*, 46 Cal.2d 690, 694 [299 P.2d 231]; *Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557].) ▉ "Such a judgment, when attacked on evidentiary grounds, must be affirmed when there is any evidence, direct or circumstantial, to support the findings of the trial court. Stated negatively, such a judgment cannot be reversed unless there is no evidence, direct or circumstantial, to support the findings. These rules are elementary." (*Seeley* v. *Combs*, 65 Cal.2d 127, 129 [52 Cal.Rptr. 578, 416 P.2d 810]; *Grainger* v. *Antoyan*, 48 Cal.2d 805, 807 [313 P.2d 848].)

▉ "In its broad, general sense the concept of fraud embraces anything which is intended to deceive, including all statements, acts, concealments and omissions involving a breach of legal or equitable duty, trust or confidence which results in injury to one who justifiably relies thereon. ▉ The elements of actionable fraud are set out in *Zinn* v. *Ex-Cell-O Corp.*, 148 Cal.App.2d 56, 68 [306 P.2d 1017]. Without quoting exactly, they are: (1) a false representation, actual or implied, or the concealment of a matter of fact, material to the transaction, made falsely; (2) knowledge of the falsity, or statements made with such disregard and recklessness that knowledge is inferred; (3) intent to induce another into relying on the representation; (4) reliance by one who has a right to rely; and (5) resulting damage. All of these elements must be present if actionable fraud is found; one element absent is fatal to recovery. ▉ There is no absolute or fixed rule for

determining what facts will constitute fraud; whether or not it is found depends upon the particular facts of the case under inquiry. ▮ Fraud may be proved by direct evidence or it may be inferred from all of the circumstances in the case. (*Jorgensen* v. *Jorgensen,* 32 Cal.2d 13, 18, 21 [193 P.2d 728].) 'Actual fraud is always a question of fact.' (Civ. Code, § 1574.)'' (*Pearson* v. *Norton,* 230 Cal.App.2d 1, 7-8 [40 Cal.Rptr. 634].)

▮ Of course, appellants' argument that there is no evidence to show that they knew ''that the leases in any way were not proper'' begs the question for the issue is not whether the leases were improper but whether defendants had a duty to disclose the rental concessions not shown by the leases to plaintiffs and failed to do so. It cannot be denied that in some areas it is common to give such concessions to fill up new buildings but the propriety of this practice does not resolve the basic issue whether plaintiffs knew of the practice and knew that it had been used by defendants to fill up vacancies in the Cedros property and whether defendants had a duty to disclose what they had done and did not do so. The trial judge accepted the testimony of Mary Ach and her daughter and found that plaintiffs did not know either about the practice or that defendants had given rental concessions to tenants of the Cedros apartment building; such finding will not be disturbed by this court.

The leases, although drawn and executed in June and July, disclose on their face that they were executed as of the time the tenancy commenced, thus leading one to assume that the tenants moved in and their tenancy commenced on the date of the lease although it was admitted by defendants that in all but one case there was a two and usually three months' rental allowance. And the evidence demonstrates that defendants knew the rentals set forth in the leases based upon a yearly rental were false and misleading, and that the false assumption created by the manner in which the leases were drawn was indeed intended by them. Becker testified that the manager drew the leases but he gave instructions as to how they should be drawn, and that he told the manager not to indicate the rental concessions in the leases and in each to show the lease starting at the end of the concession. Mrs. Becker testified that rental concessions were made; that the leases were executed by the manager under her instruction; that all rental concessions were made with their (Beckers') approval because the manager had no authority to grant them

unless cleared with her and/or Mr. Becker; and that she helped her husband draw up the prospectus. Charles Finkelstein admitted that he knew that the rental concessions were given and, contrary to appellants' representation in their opening brief that "he did not know whether the leases showed the concessions given," conceded that he was aware of the manner in which the leases were drawn which failed to mention the concessions.

We conclude, as did the trial judge, that these leases and the way in which they were drawn reflect a scheme of giving rent concessions to inflate the rentals above their true market value so that a higher price could be obtained for the apartment building. Unquestionably the leases were drawn without reference to the concessions in order to mislead prospective buyers. Dale Becker admitted he would get a better price if the building were full, and it is obvious that he felt the importance of this should be stressed in the prospectus. The rental concessions did in fact fill the building and gave a false picture of the true rental situation. The manner in which the scheme operated is reflected in the testimony of the Beckers and the former tenants, Mr. Burnstein, Miss Sego and Mr. O'Brien. That knowledge of the fact of the rental concessions was material and important to a buyer and defendants knew this, is reflected in the evidence that the Beckers gave the rental concessions, the manager drew the leases under the Beckers' supervision and at Dale Becker's instructions and with Mrs. Becker's knowledge did not indicate therein the fact of the rental concessions; Dale Becker's testimony that he did tell plaintiffs of the rental concessions at the escrow office (although disbelieved by the trial judge); Mary Ach's testimony that two months after the purchase when she discovered the concessions through the tenants she found that she could not rent the apartments without them, she relied on the yearly rental set out in each lease in determining whether to buy the property and she would not have bought the building had she known of them; the testimony of plaintiffs' expert, Mr. Crystal; and Dale Becker's testimony that he would get a better price if the building were full, wanted the building full in order to sell it and instructed that "ALL LEASED EXCEPT OWNER'S APARTMENT" in Exhibit 1 (prospectus) be printed in capital letters. Without question plaintiffs were misled by the manner in which the apartment leases were drawn, relied upon the leases in figuring the projected income of the property, and would not have bought the building had they known of the rental concessions.

■ Appellants' objection that no agency was established is neither timely nor meritorious. It ignores the pretrial order containing the stipulation "that the named defendants [Swan Imojean Finkelstein and Charles Finkelstein], through Dale L. Becker and Vivian M. Becker sold the above mentioned property to plaintiffs for $350,000," and their failure to raise the issue of agency on pretrial. The issue not having been raised at the pretrial conference and not having been listed in the pretrial order as one remaining in dispute, agency was no longer an issue in the case at the trial. (*Perry* v. *Thrifty Drug Co.,* 186 Cal.App.2d 410, 412 [9 Cal.Rptr. 50].) Actually there was little or no question of agency in the trial. As to the Finkelsteins, the stipulation established that the Beckers were their agents in the sale of the property and that "through Dale L. Becker and Vivian M. Becker" sold it to plaintiffs for $350,000; and the record shows that Charles and his wife signed the escrow instructions and shared in the proceeds of the sale with the Beckers. ■ "[W]here an agent acting within his actual or apparent authority procures a sale of property by means of fraud, the principal is jointly liable with the agent for damages incurred thereby, even though the principal is innocent of personally participating in the fraud, when he accepts and retains the benefits which accrue from the transaction." (*Crawford* v. *Nastos,* 182 Cal. App.2d 659, 667 [6 Cal.Rptr. 425, 97 A.L.R.2d 840].)

■ Finally, appellants argue that the trial court erred in assessing damages because there is not sufficient evidence to support its finding of value of the property at the time of sale. In accord with section 3343, Civil Code[3] the trial court found "that plaintiffs were . . . damaged in the sum of $10,000, being the difference between $350,000 paid by the defendants and the actual value of the building on the date of purchase, to wit, the sum of $340,000." Appellants' real complaint is that the evidence shows various appraisals at the time of sale to be from $273,500 to $374,650 but none $340,000, thus the court's finding has no support.

Dale Becker testified that his opinion of the value of the

[3]Section 3343, Civil Code, provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.

"Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

property on May 7, 1964, is $374,650; defendant Charles Finkelstein testified that it is "in the neighborhood of $370,000"; defendants' expert witnesses Strattman and Rice testified to $360,000, and $346,500 to $356,500, respectively. Mr. Rice testified that his appraisal of the value of the property at the time of sale on the cost approach is $337,960, on the income evaluation approach (the giving of 15 months' rent for 12 months' price would make a difference in the value of the building, would make the value lower) the fair market value is $344,000, and on the market data and comparative approach the evaluation range is $346,500 to $356,500. Mr. Crystal, plaintiffs' expert, testified that his appraisal of the value of the property at the time of sale on the market data approach is $275,000, on the cost approach $278,750, and on the income approach, on which he based his final appraisal, $273,500.

We do not understand that in assessing damages the trial court is precluded from balancing and weighing the testimony of the witnesses. Nor do we believe under the evidence in this case, that the court could not determine the value to be between the lowest appraisal of $273,500 and the highest of $374,650 and fix the figure at $340,000. The question of damages was one of fact for the trial court (*Sanfran Co.* v. *Rees Blow Pipe Mfg. Co.,* 168 Cal.App.2d 191, 206 [335 P.2d 995]), and we think on the record before us, it reached a proper and fair result on the issue, as well as on all the other issues presented by the case.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.