In the Matter of PETROLEUM CORPO-
RATION OF AMERICA, Bankrupt.

HAWAIIAN INVESTORS, Appellant,

v.

H. L. THORNDAL, Trustee in Bankrupt-
cy of Petroleum Corporation of Amer-
ica, Bankrupt, Appellee.

No. 19415.

United States Court of Appeals
Eighth Circuit.

Nov. 5, 1969.

Bruce M. Van Sickle, of McGee, Van Sickle, Hankla, Backes & Wheeler, Minot, N.D., for appellant.

Frank F. Jestrab, of Bjella & Jestrab, Williston, N.D., for appellee; Harry M. Pippin, Williston, N.D., with him on the brief.

Before VOGEL, MATTHES and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

On this appeal, we consider the propriety of a judgment on counterclaims aggregating more than $165,000.00 entered by the referee in bankruptcy and confirmed by the district court against appellants, called Hawaiian Investors. We have jurisdiction. Bankruptcy Act, § 24, 11 U.S.C. § 47.

Prior to 1959, some 267 residents of Hawaii, looking for profit in North Dakota oil, separately entered into contracts with Petroleum Corporation of America (PCA), a Colorado corporation then doing business in North Dakota, whereby PCA agreed to assign to each Investor a percentage interest in specific oil and gas leases on North Dakota property. The Hawaiians invested in excess of 1.6 million dollars.

PCA was adjudicated bankrupt on January 3, 1959. As a result, instead of reaping profits, the Hawaiian Investors sustained a complete loss of their investments.[1]

Each Hawaiian Investor filed a creditor's claim in the initial bankruptcy proceedings for the amount that he or she had paid PCA pursuant to the contracts. PCA's trustee in bankruptcy, H. L. Thorndal, denied these claims and asserted counterclaims alleging that each Hawaiian Investor, as a "mining partner" of PCA, was indebted to the trustee for debts PCA had incurred in the oil drilling operations.[2] Each Hawaiian Investor denied the allegations and each contested the bankruptcy court's jurisdiction to adjudicate the counterclaims.

On August 23, 1960, the referee in bankruptcy, the late Charles M. Pollock, denied the creditors' claims of the Hawaiian Investors. Referee Pollock also ruled that he had jurisdiction to hear the counterclaims. The district court reviewed and approved these rulings. In

---

1. The agreements for assignment of oil and gas interests were not recorded. After bankruptcy, the referee, in an order dated August 23, 1960, determined that the trustee was vested with title to the oil and gas leases free of all claims of the Hawaiian Investors under § 70(a) (5) of the Bankruptcy Act, 11 U.S.C. § 110(a) (5). The trustee thereafter administered those leases as the bankrupt's sole property.

2. A typical counterclaim alleged:

"1.

That Petroleum Corporation of America and the claimant above named heretofore entered into a certain agreement, a copy of which has been by said claimant annexed to his claim, which said agreement is by express reference incorporated herein and made a part hereof.

2.

That under and by virtue of the terms of the agreement above mentioned, the above named claimant and Petroleum Corporation of America became mining partners.

3.

That pursuant to the agreement above set forth, the parties thereto drilled certain oil wells; that drilling contractors, laborers and materialmen were not paid by the claimant or Petroleum Corporation of America for services rendered and materials furnished in drilling the said oil wells, and claim as due and owing to them the sum of approximately Four Hundred Thousand and no/100 ($400,000.00) Dollars.

4.

That the above named claimant is indebted to H. L. Thorndal, Trustee in Bankruptcy, in the amount of Four Hundred Thousand and no/100 ($400,-000.00) Dollars."

1963, the Hawaiian Investors unsuccessfully sought a dismissal of the counterclaims or a change of venue to Hawaii. This litigation remained at rest until 1966 when, following liquidation of substantially all of the bankrupt's estate, the trustee asked Referee Pollock's successor to schedule a hearing to assess money damages against the Hawaiian Investors as "co-partners of the bankrupt".

The present referee assumed that Referee Pollock's 1960 order established that the Hawaiian Investors and PCA were mining partners[3] and that as such the Hawaiian Investors incurred joint and several liability to all of the creditors in each drilling venture. Thus, the present referee scheduled a hearing for the sole purpose of determining the amount of such liability.[4] After hearing evidence which established the amount of expenses and charges that were still unpaid as against different well drilling projects, the present referee, in January of 1968, entered judgment jointly and severally against the Hawaiian Investors.[5] They appeal from the order of the district court which affirmed that judgment.

The Hawaiian Investors in essence here protest that they have never been adjudicated to be mining partners of PCA. They deny any liability to the trustee for the claims he asserts against them. These contentions require a brief review of some of the early bankruptcy records and proceedings affecting these appellants.

On April 14, 1960, Referee Pollock informed counsel that he would hear one claim as a test case, that of Raymond D. K. Lau which had been selected by counsel for the Hawaiian Investors, to determine the rights of the "contract holders". On August 23, 1960, Referee Pollock ruled that Lau possessed an ownership interest rather than a creditor's claim against the bankrupt. The referee recited as one conclusion of law that Lau and PCA were "mining partners".

However, Referee Pollock, noting that even if Lau could be deemed a creditor his claim would be subordinate to the rights of general creditors, stated in a contemporaneous memorandum opinion:

"From the evidence at hand, it would appear conclusively claimant purchased an interest in physical assets of the bankrupt, separate and distinct from an interest in the company, and further agreed to enter into a joint venture with bankrupt in developing such properties. *This could well be called a 'mining partnership', using the vernacular of the trade.*

*But whether or not the claimants be called mining partners, co-adventurers or investors, they are participants in the common enterprise."* (Emphasis added.)

In addition, Referee Pollock said:

"It is the opinion of this Referee, however, that notwithstanding the ju-

---

3. The present referee's pre-judgment orders recite:
   "The opinion that the claimants were mining partners of the bankrupt was filed by the then Referee Charles M. Pollock on August 23, 1960, in a test case *agreed to by the parties,* and the Referee's decision was affirmed * * *" [and] " * * * constitutes the law of the case."

4. The notice of hearing, dated September 6, 1966, directed to the respective Hawaiian Investors called for a hearing upon: "The assessment of money damages due unto the Bankrupt against the mining partners of the bankrupt, under the au-

thority of the Order of the Referee Chas. M. Pollock dated August 23, 1960 [.] "

5. As a result of the hearing, the referee assessed damages jointly and severally against those Hawaiian Investors who by investment had participated in the various drilling programs as follows:

| | |
|---|---|
| Investors in program #1 | $ 16,546.80 |
| Investors in program #2 | 29,833.63 |
| Investors in program #3 | 39,400.23 |
| Investors in program #4 | 23,074.69 |
| Investors in program #5 | 4,207.11 |
| Investors in program #6 | 24,356.38 |
| Investors in program #7 | 19,814.23 |
| Investors in program #8 | 8,364.41 |
| Total Judgment | $165,597.48 |

risdiction of the Referee to determine the issues by the counterclaim and the reply raised, by reason of the fact that the Trustee can in no event recover on his counterclaim against claimant until all of the physical assets of the bankrupt's estate have been exhausted, *it would be improper and premature at this time to determine the issues thus raised.*" (Emphasis added.)

We read Referee Pollock's conclusion of law that Lau and PCA were mining partners in light of his memorandum opinion and other determinations. See Southern Pacific Land Co. v. United States, 367 F.2d 161, 162, n. 1 (9th Cir. 1966), cert. denied, 386 U.S. 1030, 87 S. Ct. 1478, 18 L.Ed.2d 592 (1967); American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., 292 F.2d 640, 642 (9th Cir. 1961); Stone v. Farnell, 239 F.2d 750, 755 (9th Cir. 1957). In so doing, it is readily apparent that Referee Pollock used "mining partnership" as a generally descriptive term to indicate only that Lau possessed some form of ownership interest in the bankrupt's estate as opposed to a creditor's claim, not as an adjudication that Lau and others similarly situated actually constituted mining partners of PCA. Referee Pollock's order and opinion, fairly read, support no other conclusion.[6]

Our conclusion in this regard is further supported by later action taken by Referee Pollock. After considering the 1963 motion of the Hawaiian Investors for dismissal for want of prosecution or change of venue, in a memorandum opinion accompanying his order denying relief, Referee Pollock again articulated the limited nature of the 1960 order in leaving unresolved all issues raised by the counterclaims. He stated:

"The *Lau* case, chosen by counsel, was to test *all* the *rights* of the Hawaiian Investors, * * * *As a result of the Lau case, the investors have been determined to be just that, not creditors.*

The only matters to be resolved is as to the *liability, if any,* on the *so-called 'mining partnership'* they entered into. In each case the contract is one file, as in the *Lau* case. Interpretation of such written agreements is a matter of law, not fact. No need to go to Honolulu to determine that. As the counterclaims are by the trustee, representing the creditors, and as the investors have no status as creditors, the testimony to be considered, *if liability is established,* is the amount thereof. All that evidence is in this District, none in Honolulu." (Emphasis added.)[7]

■ In the instant proceedings in bankruptcy, the trustee obained a judgment against the Hawaiian Investors as mining partners obligated jointly and severally to the creditors for all unpaid claims for goods, materials or services furnished in the operation of the eight drilling projects. That judgment cannot stand in the absence of an adjudication of the underlying liability issue of whether the Hawaiian Investors and PCA constituted a "mining partnership". From our review of the prior orders and judgments in bankruptcy,[8] we are satis-

---

6. In another part of his order, Referee Pollock ruled that the Hawaiian Investors lost their unrecorded fractional ownership interests in the oil and gas leases involved. *Supra*, note 1. That ruling *would not have been appropriate if the* bankrupt and the Hawaiian Investors constituted a partnership. Under those circumstances, the Hawaiian Investors, as partners of a bankrupt partner, would have had the right to establish and retain their ownership interests in partnership property regardless of the status of record title. See Todd v. Pettit, 108 F.2d 139 (5th Cir. 1939); Hart v. Ronan,

58 N.D. 516, 226 N.W. 620 (1929); 1 Collier on Bankruptcy, ¶5.29, p. 741 (14th ed.); 4 Collier on Bankruptcy, ¶70.35, pp. 452–453 (14th ed.).

7. The district judge approved Referee Pollock's action in denying the motion. We affirmed. Hawaiian Investors v. Thorndal, 339 F.2d 807 (8th Cir. 1965).

8. Since the printed Appendix has not included all materials relevant and necessary to the determination of the issues presented, we have examined the relevant orders and documents dated back to 1959, as authorized by Fed.R.App.P. 30.

fied that such issue has never been litigated nor settled. Our conclusion on this issue alone requires reversal of the judgment.

██ We, however, elect not to rest our decision solely on that ground. Even if the Hawaiian Investors were mining partners of PCA and were jointly and severally liable to those creditors who filed claims in bankruptcy against PCA, PCA's trustee possesses no power [9] to assert the rights of those creditors.

Although the counterclaims might be read as an assertion by the trustee of rights possessed by the bankrupt to seek contribution for payment of drilling expenses from the Hawaiian Investors in proportion to their interests in the oil and gas leases pursuant to contract,[10] neither the trustee nor the court of bank-

9. We use the term power to relate to the standing of the trustee to press these particular claims against the Hawaiian Investors but not to jurisdiction over their persons. The Hawaiian Investors had subjected themselves to the jurisdiction of the bankruptcy court by voluntarily filing their claims against PCA. See Hawaiian Investors v. Thorndal, 339 F. 2d at 810.

10. A sample contract between PCA and the Hawaiian Investors provided:

"(1) For and in consideration of the sum of One Hundred Fifty and no/100 Dollars ($150.00) in hand paid by the Assignee, the receipt whereof is hereby acknowledged by the Assignor, the Assignor agrees to convey and/or assign to the Assignee, *an undivided 1% interest in and to the Assignor's interest in and to the Oil and Gas Lease covering the above described premises.* * * *

(2) For and in consideration of the further sum of Twenty-Four Hundred Fifty & no/100 Dollars ($2,450.00) in hand paid by the Assignee to apply on the cost of drilling a well on the above described premises, the receipt whereof is hereby acknowledged by the Assignor, the Assignor agrees to commence operations for the drilling of a well for Oil and Gas on the above described premises on or before the 20th day of February, 1958, A.D., and to continue the drilling of said well for Oil and Gas with due diligence to the geological formation, commonly known as the Midale-Nesson, or approximately 5,900 feet, unless Oil and Gas in commercial quantities be found at a lesser depth.

(3) The cost of drilling of said well to casing point, as aforesaid, will be borne by the Assignor.

(4) Upon the drilling of said well aforesaid, if a formation or formations is encountered having, in the judgment of the Assignor, a sufficient showing of Oil or Gas to warrant the completion and equipping of said well, *As-signee agrees to pay its proportionate share of the cost of the completion and equipping of said well including the costs of casting, testing, equipping, and all other necessary expenses,* incident to producing or attempting to produce Oil and Gas from said well, *and Assignee further agrees to pay his proportionate share of the cost of operating said well and marketing Oil or Gas therefrom,* said payments to be made promptly by the Assignee upon demand of the Assignor. *The estimated cost of equipping and testing your 1% interest is four hundred and no/100 Dollars ($400/00). In the event it should cost less than the estimated cost of equipping your said interest, then the balance will be refunded. In the event it should cost more, you will be billed for any additional cost of equipping and testing.*

* * * * *

(6) Should the first well be drilled, as aforesaid, produce oil or gas in commercial quantities, the parties hereto agree that said Assignor shall continue to act as Operator of said Oil and Gas Lease, and *all costs of drilling, testing, completing, and equipping any additional wells drilled on said premises, shall be borne proportionately by all parties,* their respective heirs, executors, administrators, or assigns, and Assignor shall forthwith execute and deliver to Assignee a good and sufficient assignment of Assignee's interest in such well or wells.

(7) It is agreed that in the event the first well drilled is not a producing well and is abandoned, and *the Assignor elects to drill a second well, the Assignee agrees to pay his or its proportionate share of the drilling costs of said second well* at least five days prior to the commencement of said drilling operation. Notice to be given of the commencement date by the Assignor to Assignee through the regular mail at the above address of Assignee. *In the event said Assignee fails to pay said propor-*

ruptcy has so interpreted them. In any contractual claim made by PCA's trustee for oil drilling expenses, each Hawaiian Investor's contractual liability would be measured and limited by his ownership interest, usually one or two per cent, in a particular oil and gas lease. The trustee here asserts no such claim to assess damages for contribution on a pro rata basis against each Hawaiian Investor. Rather, he here presses the collective remaining claims of all of PCA's creditors arising out of the oil drilling programs.

Generally, the trustee of a bankrupt has no power to press the general claims of the bankrupt's creditors against third parties. See Barnes v. Schatzkin, 215 App.Div. 10, 212 N.Y.S. 536 (1925), aff'd, 242 N.Y. 555, 152 N.E. 424, cert. denied, 273 U.S. 709, 47 S.Ct. 100, 71 L.Ed. 852 (1926).[11] Collier summarizes the rule:

"In any event, the claims sued upon by the trustee must belong to the bankrupt estate, and a trustee may not sue upon claims not so belonging, even though they were assigned to him by creditors for convenience or other purposes." 2 Collier on Bankruptcy, ¶ 47.-05[1], p. 1746 (14th ed.).

However, mere assertion of the general rule cannot end our inquiry. It is also necessary to ascertain whether the "strong arm clause" of § 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c), has modified or eroded the rule so as to enable the trustee to assert creditors' claims in this case. At the time of this bankruptcy, the applicable version of that clause read:

"The trustee, as to all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt could have obtained a lien by legal or equitable proceedings at the date of bankruptcy, shall be deemed vested as of such date with all the rights, remedies, and powers of a creditor then holding a lien thereon by such proceedings, whether or not such a creditor actually exists." 11 U.S.C. § 110(c) (1952), as amended, 11 U.S.C. § 110(c) (1966).

The strong arm clause was designed to assure the trustee the rights of a lien creditor upon property in which the bankrupt has some interest or as to which the bankrupt might be the ostensible owner. See House Report, No. 2320, 82d Congress, 2d Sess. 1952; 4A Collier on Bankruptcy, ¶ 70.03[4], pp. 40–41 (14th ed.). The reference to an

---

*tionate share as above set forth, then and in that event said Assignee forfeits all right, title and interest in and to said lease and any right to participate therein,* said right reverting to Assignor.

\*      \*      \*      \*      \*

(9) It is agreed that *in the event Assignee should fail, neglect or refuse to pay his or its proportionate part of any expenses or charges within thirty (30) days from the date of billing, Assignee shall pay to Assignor 150 per cent of such expenses and charges owing and Assignor is hereby given and granted a lien against the interests of said Assignee for the amount of said unpaid bill* with full right and authority to collect, receive and retain all of Assignee's income from said land or lease until said unpaid indebtedness be paid in full." (Emphasis added.)

11. *See, e. g.,* Fitzgerald v. Marshall, 161 F.Supp. 470 (D.Colo.1958); Railsback

v. Snyder, 285 F. 440 (S.D.Fla.1922); Morris v. Sampsell, 224 Wis. 560, 272 N.W. 53 (1937), cert. denied, 305 U.S. 608, 59 S.Ct. 67, 83 L.Ed. 386 (1938); Hicklin v. Cummings, 211 Iowa 687, 234 N.W. 530, 72 A.L.R. 822 (1931). *But, cf.* Henderson v. Rounds & Porter Lumber Co., 99 F.Supp. 376 (W.D.Ark.1951). Later cases approving, considering or applying a doctrine limiting the trustee's right to pursue the creditors' claims include: Hi-Pro Fish Products, Inc. v. McClure, 346 F.2d 497 (8th Cir. 1965); Palmer v. Travelers Ins. Co., 319 F.2d 296 (5th Cir. 1963); Harris v. Standard Accident & Ins. Co., 297 F.2d 627 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); Todd v. Pettit, 108 F.2d 139 (5th Cir. 1939). Barnes v. Schatzkin, *supra,* has also been criticized in 39 Harv.L.Rev. 768 (1926), particularly for refusal to recognize the creditors' assignment of claims to the trustee.

actual or hypothetical creditor denotes a creditor of the bankrupt. See Lewis v. Manufacturers National Bank, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961); 4A Collier on Bankruptcy, ¶ 70.49, pp. 595–598 (14th ed.).

■■ The creditors' armor worn by the trustee by virtue of the strong arm clause of § 70(c) affords no assistance to PCA's trustee here. Only PCA, one partner of the assumed mining partnership, has been declared bankrupt. Accordingly, the power of an actual or hypothetical creditor of one partner to reach assets in satisfaction of creditors' claims against that partner necessarily defines the limits of the trustee's power to assert creditors' claims under § 70(c). A creditor of a bankrupt partner could obtain a lien or judgment against only that partner's personal property and his share of the partnership assets, and not against other partners' personal property or partnership interests. See Kaufman-Brown Potato Co. v. Long, 182 F.2d 594 (9th Cir. 1950); Todd v. Pettit, 108 F.2d 139 (5th Cir. 1939); Sturm v. Ulrich, 10 F.2d 9 (8th Cir. 1925); 1 Collier on Bankruptcy, ¶ 5.30, p. 741 (14th ed.).

■■ Our analysis that powers of a creditor cast upon the trustee in this case by virtue of § 70(c) are limited ones gains strength by examination of the rights of a creditor analogous to those represented by the instant trustee, one who may hold a judgment against a partnership, rather than against an individual partner. Such creditor may levy against partnership property, but not property of an individual partner not personally served in the action. Detrio v. United States, 264 F.2d 658 (5th Cir. 1959); In re Panitz & Co., 270 F.Supp.

448 (D.C.Md.), aff'd sub nom. Hammerman v. Arlington Federal Savings & Loan Ass'n, 385 F.2d 835 (4th Cir. 1967). See also Grainger v. Antoyan, 308 P.2d 453 (Cal.App.), aff'd, opinion vacated, 48 Cal.2d 805, 313 P.2d 848 (1957), and cases collected in Annot., 100 A.L.R. 997, 999 (1936). The forum state follows a like rule. International Shoe Co. v. Hawkinson, 73 N.D. 677, 18 N.W.2d 761 (1945). Similarly, when only a partnership is declared a bankrupt, a creditor's claim as filed in that bankruptcy cannot be enforced by the trustee against an individual partner's assets unless partnership assets are insufficient and the individual partner's creditors are first paid. See 1 Collier on Bankruptcy, ¶ 5.19, pp. 721–722; ¶ 5.25, pp. 730–732 (14th ed.).

We find no statutory authority in § 70(c) or elsewhere in the Bankruptcy Act for the trustee to sue third parties on this type of creditor's claim. It is unnecessary in the fair administration of the bankrupt's estate to extend the reach of the law to permit or require the trustee to undertake collection of the creditor's purely personal claims against those parties whose basic relation with the bankrupt is that of sharers in a common liability. At least, under the version of the strong arm clause applicable in this case, we do not so extend the grasp of the trustee's authority.[12]

Because there has never been an adjudication of the underlying partnership issue and because the trustee has no power to enforce creditors' personal claims against the Hawaiian Investors, we reverse the judgment of the court of bankruptcy and on remand direct that the counterclaims be dismissed.

12. The effect of later amendments to § 70(c) is not before us. See 11 U.S.C. § 110(c) (1966).